Floyd Raymond Cooper

*v.*

State of Tennessee.

356 S. W. 2d 405.

(*Nashville,* December Term, 1961.)

Opinion filed April 4, 1962.

James C. Cunningham, Clarksville, for plaintiff in error.

George F. McCanless, Attorney General, Thomas E. Fox, Assistant Attorney General, Nashville, for the State.

Mr. Justice White delivered the opinion of the Court.

The plaintiff-in-error, defendant, was indicted and tried upon a charge of murder in the first degree. The jury in returning its verdict found the defendant guilty of murder in the second degree and fixed his punishment at confinement in the State Penitentiary for a period of not more than twenty years.

A motion for a new trial was seasonably filed, argued and overruled. The defendant then moved in arrest of judgment and this motion, too, was overruled. From the final judgment of the Court the defendant prayed and perfected his appeal within the time allowed. He has now assigned errors consisting of twelve in all. The first three assignments are to the effect that the evidence does not support the verdict; that it is contrary to the weight of the evidence and the evidence preponderates against the verdict and in favor of the defendant. Further that the verdict of the jury evidences passion, prejudice and caprice. In considering these assignments, along with all of the others, we think it important to relate the facts in some detail which are fairly and accurately stated in briefs filed by counsel.

From the record it appears that the defendant graduated from the Clarksville High School in the class of 1954 and immediately thereafter went to work as an automobile mechanic. He was married and subsequently divorced, and by this marriage he became the father of one child. During the early part of November, 1960, he became the father of another child born out of wedlock to Mary Burgess with whom he was living at that time. He and Mary Burgess were married on March 25, 1961. The defendant went to trial on April 15, 1961.

It appears that on November 28, 1960, the defendant came home from his work at about 5:00 o'clock P.M. to the place where he and Mary Burgess were living in a house trailer in New Providence, near the City of Clarksville. At about 6:00 or 6:30 o'clock P.M. on the same evening, they decided to go out for an evening of dancing. Before leaving home the defendant put a two-shot "over and under" barrel .22 caliber Derringer pistol in his right hip pocket, which was a part of a gun collection kept by him to correspond with the type of pistol used on a certain television show. They were unable to gain admittance to the place they first visited because of its crowded condition. They left this place and drove around Clarksville for awhile and noticed two friends walking on the sidewalk along 3rd Street. These friends were Eddie Stroud and Bobby Herndon, soldiers stationed at Fort Campbell. Upon invitation they got in the car with the defendant and Mary Burgess. They returned to the trailer where defendant changed to warmer clothing, transferring the gun to his hip pocket and then they drove to Blackie's place on Guthrie Pike not far from Clarksville and seated themselves at a table for a party of four. In the place were some students from Austin Peay College who were members of the football squad. They had been there for some time drinking beer which had been provided for them by some friend whose name does not appear in the record. During the course of the evening there were perhaps fifteen or twenty college boys at Blackie's, but none of them knew the defendant or any member of his party and neither did the defendant nor any member of his party know any of the boys. The defendant and Mary Burgess danced while they were in

Blackie's. Some members of the college football players also danced with a waitress employed in Blackie's.

The defendant and his party then left this place and went to another where they remained for a short time and then drove back to Blackie's, and found the college football players were still there and after occupying the table which they had formerly used the defendant and Mary Burgess danced some more. Shortly after 11:00 P.M. the defendant suggested that it was time to leave since they had to be back home by 11:00 o'clock to their baby, having promised the baby sitter to return by that time.

As the defendant and his party left he and Mary Burgess went out in front of their two soldier friends who followed them. The defendant then opened the door of his car on the passenger side for Mary Burgess and she got in the car. He then started to walk around the front of his car which was parked in front of Blackie's with the front headed toward the front of the building. According to statements of some of the witnesses some uncomplimentary remarks were made by the football players to the soldiers as they followed the defendant and Mary Burgess out the door of Blackie's place. The defendant says that when he was in the act of going to his side of the car to get in and go home, as aforesaid, he saw one of the college boys appear to get in behind Bobby Herndon and he called to Bobby not to let him do that. According to the defendant, several of these college boys had backed him against the front of his car, up against the bumper, and being scared, he pulled the Derringer pistol out of his pocket, cocked it and held it behind him. He says that the deceased cursed him and sud-

denly hit him in his mouth with his fist without warning, knocking him against the hood of his car with such force that two of his teeth were knocked out and his lower lip cut through and through requiring more than a dozen stitches. A picture of the defendant was exhibited to show the condition of his mouth. The defendant says that as he was knocked back against the hood of his car he fired the pistol, firing one shot, which struck the deceased, John William Wallace, in the temple from which wound he later died.

The defendant did not know the deceased nor any other of the college boys and had no previous trouble or difficulty with him.

The defendant was arrested and taken to jail, but before being locked up he was taken to the hospital for treatment of his mouth while handcuffed to a Tennessee Highway Patrolman.

The deceased was removed from the Clarksville Hospital to a Nashville Hospital where he died several days later.

Upon a search of the defendant's automobile there was found on the back seat a .22 caliber Marlin Lever action automatic rifle in a case, fully loaded, and under the front seat a sawed off .22 caliber pump rifle, also loaded, with a nine or ten inch barrel. There was also found some pieces of chain and some .22 caliber cartridges, and a black-jack in the back of the car.

The defendant admitted shooting the deceased, but said he didn't remember what he had done with the pistol.

The evidence shows that the defendant was a fancier of guns and had obtained the Marlin Lever automatic

action .22 rifle to correspond with the same type of gun used on the television show called "The Rifle Man". He also obtained the sawed off .22 caliber pump gun to correspond with the same type of gun used on the television show called "Wanted Dead or Alive". These guns were a part of his collection along with the .22 caliber Derringer which corresponded with the same type of gun used on the television show "Yancey Derringer". He said he had kept these guns in his car and used them for target practice when not working at his job as a mechanic in the Hackberry Community which was located in the country near an old abandoned railroad bed. He claimed that he had the links of chain in his car for possible use in work as a mechanic. He denied any knowledge of the black-jack.

Generally, it is the theory of the State that the defendant shot and killed the deceased, John William Wallace, without provocation and was guilty of murder in the first degree.

Generally, it is the theory of the defendant that he did not shoot the deceased intentionally, that he had the pistol in his hand to protect himself or to scare off his assailants when the football players provoked and brought about the situation which led to the assault upon him by the deceased. It is his theory further that the deceased made a violent and unprovoked assault on him and at the moment, when he was struck, the pistol was fired, resulting in the death of Wallace. The defendant claims that he was acting in his own proper self defense and, therefore, was not guilty of any degree of homicide.

The jury rejected the theory or theories of the defendant and found him guilty of murder in the second

degree and fixed his punishment at confinement in the State Penitentiary for a period of not more than twenty years.

The defendant in his testimony admitted having drunk four or five beers during the evening. However, he was not drunk to the extent that it was noticeable by the peace officers who arrested him immediately after he shot the deceased.

The evidence seems to show that when Eddie Stroud passed the table, where several of the Austin Peay football players were seated, as he followed the defendant from Blackie's place that he cursed these students. The defendant and Mary Burgess were already on the outside of Blackie's and were near the defendant's car when this took place. Two of the football players followed Stroud to the outside, and engaged him in a heated argument about the remark that he had made. According to the theory of the State, the defendant then entered the difficulty and cursed the college student. The deceased then walked up to defendant and asked him what was going on and to which the defendant replied:—"What do you want in it for, you s.o.b." The deceased then hit the defendant in the mouth with his fist and knocked him back against the car at which time the defendant produced the pistol and shot the deceased with the result that he died a few days thereafter.

Two Highway Patrolmen testified that they took the defendant to the hospital for treatment, where the deceased was also being treated, and when they informed the defendant that the deceased could not recover he held his hands together over his shoulder and made a gesture similar to that made by successful boxer after a match.

The defendant admitted this but claimed that he was waving to Mary Cooper, his wife at the date of the trial, who appeared at the hospital at about that time.

There is nothing in this record to indicate that the defendant encouraged Eddie Stroud to insult or curse the college boys or that he expected any difficulty would arise between them. The waitress, however, did say that the defendant made some slighting remarks about their haircuts at some time during the course of the evening while all parties were still in Blackie's.

All of the witnesses agree that the time which elapsed between the striking of the blow by the deceased and the firing of the pistol by the defendant was very short. One witness said that it occurred within a matter of a split second. Another said within a second or so, and another within a little longer space of time.

The defendant complains that the witnesses Chitwood and Armstrong should not have been permitted to exhibit the weapons referred to above to the jury. When this testimony was offered no objection was made and, as a matter of fact, the witnesses were cross-examined regarding these exhibits. In the case of *Scott v. Union & Planters' Bank & Trust Co.*, 123 Tenn. 258, 262, 287, 130 S.W. 757, it was held by the Court that the cross-examination of a witness was sufficient to waive objection to his incompetent evidence.

In the case of *Anderson v. State*, 207 Tenn. 486, 497, 341 S.W.2d 385, 390, it is held:

"We think that defendants cannot complain of the admission of this evidence because it does not appear that any objection was made at the time such evidence

was offered. It is well settled that this Court will not consider an assignment of error based on the admission or exclusion of evidence unless timely objection and exception was made in the Trial Court and the Trial Court given an opportunity to make correction. Rule 14(5), 203 Tenn. 803, 805; *Turner v. State,* supra, 188 Tenn. 312, 322, 219 S.W.2d 188, 193; *Nichols v. State,* 200 Tenn. 65, 91-92, 289 S.W.2d 849, 860, and cases there cited.''

However, on the last day of the trial the defendant, through his counsel, prevailed and the Court with the approval and by agreement of the State sustained the motion to exclude such exhibits from consideration by the jury and he so instructed them, and then asked counsel for defendant ''now have I stated that correctly'', and the reply was ''I think so, Your Honor''.

While it is difficult for the Court to remove from the minds of jurors incompetent evidence, once admitted, it appears that this evidence, if incompetent, was effectively removed by the instruction of the Court and emphasis was given to its effectiveness by the fair agreement of the State that such evidence should be stricken from the record and not considered by the jury.

The Court was correct in his holding that the defendant nor his witnesses would be permitted to testify as to the purpose of the weapons found in the defendant's automobile since the defendant had insisted that their exhibition to the testimony of the witnesses for the State be excluded. The defendant insisted upon the privilege of explaining that these weapons were used for target practice. However, the brief of the defendant shows that ''Patrolman Chitwood did, however, testify that the

defendant stated he used the rifles for target practice''. The defendant should not be, and was not, allowed to introduce evidence as to why he had these rifles in his possession when he was at the same time successful in getting the evidence of their having been found in the car excluded from consideration by the jury.

■ We are not impressed with the assignments that the Court erred in permitting the Attorney General to persist in questioning the defendant and his wife, over the objection of the defendant's attorney, concerning the relationship of marriage between the parties. This relationship was a fact produced by a voluntary act on the part of the defendant. It should have been, and probably was, considered by the jury when it passed upon the credibility of these witnesses. It may have influenced the jury to some extent in their deliberation, but this way of life was chosen by this defendant and this act makes up a part of his general reputation and the jury had the right to consider it along with all of the other evidence in determining the credit which they would give to the testimony of the defendant.

■ The defendant complains about the testimony of the Highway Patrolman to the effect that the defendant reacted at the hospital as indicated hereinabove when he was informed that the deceased could not recover.

''The actions and behavior of accused when charged with the crime, or when confronted with the consequences or with the scene or surroundings of the crime with which he is charged, or when brought before the prosecuting witness for identification, or at the trial, are peculiarly relevant.'' 22 C.J.S. Criminal Law sec. 623, page 955.

We have carefully considered all of the other assignments, including those complaining about the charge of the Court and his failure to grant certain special requests, and we find them to be without merit. The charge of the Court was very fair, full and complete and, in our opinion, without error.

The State concedes in its brief that the sentence in this case should be modified to be not less than ten years or more than twenty years as shown in the action of the Court when overruling the motion for a new trial.

However, the proof shows beyond question that the defendant did not know the deceased; that he possessed no ill will against him. It also shows that the cursing of the deceased by the defendant, which is vigorously disputed by him and his witnesses, the striking of the blow upon the mouth of the defendant by the deceased resulting in the loss of one or more teeth and the firing of the pistol were all a part of one continuous act, occurring in the space of a very short time.

This was certainly an unfortunate tragedy, but from a most careful reading of this record we cannot believe that the defendant intended to kill the deceased prior to being struck in the mouth. He did not know him, he had never seen him before and had no reason for taking his life. They had not been engaged in conversation and he and his wife would have been in their car on their way home but for the fact that Stroud cursed some of the football players, but no one in particular, as he left Blackie's. When this occurred some of the boys, but not the deceased, followed Stroud outside the door where they remonstrated with him about his remarks.

The defendant at about the same time came around the front of his automobile preparing to enter it and go home when he heard and observed the difficulty between Stroud and some of the boys, but not the deceased. When the deceased came on the scene he struck the defendant with the force indicated above either because the defendant cursed him or because he, Wallace, wanted to be a part of the general difficulty or the fight which he is bound to have thought was going to take place between some or all of the parties.

Defendant upon being struck by the deceased and within a very short interval, without time for thought or deliberation, fired this small pistol which he had in his hand. Had the bullet traveled just a little higher or a little farther in its line of fire it would not have struck and killed the deceased. In other words, it does not appear that this defendant intended to take the life of this deceased prior to the fight. On the other hand, his act appears to have resulted from a sudden impulse or heat of passion.

We are aware of the general rule that the act of killing with a deadly weapon raises a presumption of malice and justifies a finding of murder in the absence of facts or circumstances rebutting the presumption. *Foster v. State,* 74 Tenn. 213, 214, 216; *Lewis v. State,* 202 Tenn. 328, 332-333, 304 S.W.2d 322.

Section 39-2409 T.C.A. defines manslaughter as:

"Manslaughter is the unlawful killing of another without malice, either express or implied, which may be either voluntary upon a sudden heat, or involuntary, but in the commission of some unlawful act."

■ The general rule is that "if a man kills another person, upon sudden heat produced by adequate provocation it is voluntary manslaughter". There must be sudden heat from such provocation to negative malice. *Young v. State*, 30 Tenn. 200 and other cases.

Again in *Haile v. State*, 31 Tenn. 248, and supported by the cases of *Manier v. State*, 65 Tenn. 595, and *Seals v. State*, 62 Tenn. 459, the Court said:—"If, upon a sudden quarrel, two persons fight, and one kills the other, this is voluntary manslaughter".

It is said in 40 C.J.S. Homicide sec. 48, Subsection (b), page 912, that "homicide resulting from mutual combat or the excitement and heat of passion arising therefrom is voluntary manslaughter. There must be a mutual intention to fight, and, it has been held, deadly or dangerous weapons must be used." Our Court in the case of *Hunt v. State*, 202 Tenn. 227, 303 S.W.2d 740, approved this statement.

■ We are convinced from reading this record that the defendant is guilty of voluntary manslaughter and not murder in the second degree. We are equally convinced that the assignments of error are without merit and that the defendant has had a fair trial, except that the jury was not justified in finding the defendant guilty of murder in the second degree. Being of this opinion, we are unwilling to affirm this case unless the State agrees that the judgment be corrected so as to find the defendant guilty of voluntary manslaughter and to the fixing of his term of imprisonment in the State Penitentiary at the minimum provided by law for voluntary manslaughter as shown by Section 39-2410 T.C.A. Of course, the correction of this judgment must be and is done with

the consent of the State. Otherwise, if the State does not consent, the case will be remanded for the fixing by the jury of some maximum term of penitentiary confinement but not less than two nor more than ten years. This action is taken by us in conformity with the reason and authority fully set out by *Forsha v. State,* 183 Tenn. 604, 194 S.W.2d 463; *Whitsett v. State,* 201 Tenn. 317, 299 S.W.2d 2 and *Hunt v. State,* supra. Costs are adjudged against the plaintiff-in-error.