JOHN RANDOLPH CLARKE, Plaintiff in Error, Defendant,

*v.*

STATE OF TENNESSEE, Defendant in Error.

402 S.W.2d 863.

(*Jackson,* April Term, 1965.)

Opinion filed February 2, 1966.

Petition for Rehearing Denied May 23, 1966.

CHARLES GALBREATH, Nashville, JAMES P. DIAMOND, CARMACK MURCHISON, Jackson, and JOHN GOODIN, Johnson City, for plaintiff in error.

GEORGE F. MCCANLESS, Attorney General, and EDGAR P. CALHOUN, Assistant Attorney General, for defendant in error.

MR. JUSTICE DYER delivered the opinion of the Court.

John Randolph Clarke, hereafter referred to as defendant, appeals from a conviction of murder in the first degree for which he has been sentenced to serve thirty years in the State Penitentiary. This crime was committed in Davidson County and, by proper change of venue, the trial was held in Madison County.

Mrs. Eva Jo Herring, a widow employed as a registered nurse, lived with her eighteen year old daughter, Paula Herring, and her six year old son, Allen Herring, in a suburban area of Davidson County. In September 1963 Paula Herring entered the University of Tennessee at Knoxville as a freshman. On Friday 21 February 1964 Paula Herring returned home from school to spend the weekend. On Saturday 22 February 1964 Mrs. Eva Jo Herring, in company with two men, left home about 7:00 P.M. leaving Paula, reading a book (All The King's Men) she had borrowed from a school mate, and Allen watching television. Paula was wearing a grey skirt, blouse and an open front grey sweater. This sweater and skirt had been purchased the previous Christmas and this was the first time they had been worn in this house.

Mrs. Herring, with two male friends, returned home about 11:00 P.M. entering through the unlocked garage and den doors to find Paula, lying face down on the den floor, dead. The victim's skirt was up over her back but her under garments had not been disturbed. The book she had been reading (All The King's Men) was missing. The youngster, Allen, said he had watched television and then went to bed. That prior to going to bed his sister (Paula) had received a telephone call. That after going to bed the telephone again rang and he got out of bed to answer it. There was a male voice on the line. Being

unable to awaken his sister Allen went back to bed. Allen thought his sister was asleep and had spilled tomato juice on herself.

Upon investigation it was determined death had been caused by two gun shot wounds in the back administered while the victim was on the floor, face down, probably in a semi-conscious or unconscious state. There was a large bruise on the left side of her face below the ear and four bruises on the right side of the face; all caused by a hard object. The coroner fixed the time of death at 9:30 P.M. C.S.T. (Nashville). Paula's watch had stopped at 10:32 P.M. E.S.T. (Knoxville) and it was shown to be her custom, when visiting home, to leave her watch on Knoxville time. One bullet was recovered partially buried in the floor underneath the body and the other one on the floor near the body. These bullets were .32 caliber and fired from the same gun. Paula's sweater was on the couch in this room and it was found to have two holes in it the same distance apart as the wounds in her back. There were blood stains and powder burns around each hole in this sweater. Paula had not been sexually assaulted.

Neighbors had heard a noise at the Herring home sometime between 9:00 and 10:00 P.M. of this night and also heard a car roar off sometime after 9:30 P.M. making a clanging noise as if metal was knocking against metal. The book (All The King's Men) Paula had been reading was found in a vacant lot several blocks away. The witness, who found this book, had heard a loud clanging noise near this lot on this Saturday night. This book, recovered 26 February 1964, was identified by a school mate who had loaned it to Paula.

The defendant met Eva Jo Herring, in the early part of February 1964, at a tavern. Later that night, with her permission, defendant visited at the Herring home taking along some beer. A short time after his arrival they engaged in sexual relations. Although defendant was married he had several girl friends and often stayed out late. After this night defendant did not see Mrs. Herring again but did call her, via telephone, several times.

Defendant and one Al Baker, had been on friendly terms for several years. These two crashed a Christmas party given by one of their girl friends in 1963. In the course of this party a mild skirmish ensued and defendant waved a .32 automatic pistol around. Later defendant, Baker, Joe Hurst and Murray Cook started to Hurst's apartment and on the way defendant was chided to the effect his gun was loaded with blanks. At Hurst's apartment defendant fired the gun into the snow covered ground beside the sidewalk to prove the bullets were not blanks. Later this bullet was recovered and was found to have been fired from the gun used in this murder.

On the night of this murder, about 7:30 P.M., Baker went to Ruth's Diner and noticed defendant making a telephone call. Upon completing this call defendant and Baker talked for some twenty minutes. Defendant told Baker he had just been talking to a freshman from the University of Tennessee. That he knew this girl's mother, having had sexual relations with the mother, and had invited himself over with a six-pack of beer. That he would make sexual advances to the girl and if not successful would then just wait for the mother. Defendant left this Diner about 8:00 P.M.

On Monday night 24 February 1964 defendant, after being advised of his constitutional rights, was interrogated by the police for several hours and released. Upon release defendant left in a car owned by his wife and it was noted this car, upon starting, made a clanging noise similar to a noise made by metal against metal. All during the course of interrogation defendant denied any part in this murder, but did admit owning a .32 caliber pistol, which had been stolen from him prior to the murder. The theft of the pistol was not reported to police. Also during the course of this questioning defendant admitted he had taken a dark suit to the dry cleaners that same morning. The police obtained this suit from the dry cleaners. Upon examination experts in the field found woolen and orlon fibers on the front of this suit which were identical to the fibers from the clothing worn by Paula the night of her murder. The expert testifying said it would take more than a casual brushing to transfer these fibers from Paula's clothing to this suit.

Several witnesses, for both the prosecution and the defense, made the trip from the Herring home to defendant's home using different routes. The time recorded for the trip was from fourteen to twenty four minutes depending on the route taken.

Defendant testified, on the night of this murder, he had made the rounds of several taverns from 5:00 P.M. until 9:00 P.M. and arrived home at 9:30 P.M. Defendant's wife testified he arrived home on this night about 9:30 P.M. Although defendant testified in detail as to his whereabouts the testimony of other witnesses is in conflict. Defendant said on this night he was wearing light trousers and an "Eisenhower" jacket while most witnesses who saw him said he had on a dark suit. Defendant

said he went to a place known as ''Cheeko's'', conversed with the proprietor, and left at 7:30 P.M. This was denied by the proprietor of ''Cheeko's'' who said he did not see defendant the night of the murder. Defendant claimed he was at Ruth's Diner from 8:30 P.M. until 9:00 P.M. and did not see Al Baker nor made a telephone call from this place. Both Ruth (of Ruth's Diner) and Baker testified, when Baker arrived at this diner that night, defendant was making a telephone call and later Baker and defendant had a talk together. Both of these witnesses said defendant left the diner at 8:00 P.M. wearing a dark suit.

The assignments of error may be summarized as follows:

1. The necessary elements of murder in the first degree were not proved.

2. The Court erred in allowing testimony to the effect defendant refused to permit certain scientific tests to be made even though the Court later instructed the jury to disregard this evidence.

3. A suit of clothes belonging to defendant was seized by police in violation of his constitutional rights and evidence collected therefrom should not have been admitted.

4. A new trial should have been granted on newly discovered evidence.

5. The circumstantial evidence allowed reasonable hypothesis inconsistent with guilt.

The defendant was put to trial under a two count indictment charging (1) premeditated murder and (2) murder while attempting to rape. Defendant insists the State has has not proved either premeditation or attempt

to rape citing *Witt v. State,* 46 Tenn. 5 (1868). In the *Witt* case we find the following:

The fact of the killing being proved, the law presumes only murder in the second degree. Malice is implied from the mere fact of killing; but it is not presumed from the killing alone, that the murder was perpetrated by means of poison, lying in wait, or by any other kind of willful, deliberate, malicious or premeditated killing, or in the perpetration of any of the felonies mentioned in section 4598, of the Code.

 Paula was shot to death and malice is inferred from the use of a deadly weapon. *Batts v. State,* 189 Tenn. 30, 222 S.W.2d 190 (1946); *Cooper v. State,* 210 Tenn. 63, 356 S.W.2d 405 (1962). She was not only shot once but twice and then in the back while she lay face down on the floor in a semiconscious or unconscious condition from the results of a beating about the face. These facts, accepted by the jury, are enough to support a finding this murder was premeditated. The following from *Lewis v. State,* 40 Tenn. 127 (1859) is appropriate:

The distinctive characteristic of murder in the first degree is premeditation. This element is super-added, by the statute, to the common law definition of murder. Premeditation involves a previously formed design, or actual intention to kill. But such design, or intention, may be conceived, and deliberately formed, in an instant. It is not necessary that it should have been conceived, or have preexisted in the mind, any definite period of time anterior to its execution. It is sufficient that it preceded the assault, however short the interval. The length of time is not of the essence of this constituent of the offense. The purpose to kill is no less premeditated, in the legal sense of the term, if it

were deliberately formed but a moment preceding the act by which the death is produced, than if it had been formed an hour before. The mental state of the assailant at the moment, rather than the length of time the act may have been premeditated, is the material point to be considered. The mental process, in the formation of the purpose to kill, may have been instantaneous, and the question of vital importance is—was the mind, at that moment, so far free from the influence of excitement, or passion, as to be capable of reflecting and acting with a sufficient degree of coolness and deliberation of purpose; and was the death of the person assaulted, the object sought to be accomplished —the end determined upon.

That this holding from the *Lewis* case is the general rule as shown by Wharton's Criminal Law and Procedure, Anderson, Vol. 1, Sec. 267, pp. 563-568 (1957) where we find the following:

Deliberation and premeditation involve a prior intention or design to do the act in question. It is not necessary, however, that this intention should have been conceived at any particular period of time, and it is sufficient that only a moment elapsed between the plan and its execution, as long as the jury can conclude that there was some appreciable interval however small. It is sufficient that with the intention to commit the act of appreciation of the result likely to follow appeared to the defendant at the time the act was committed, or that he understood and contemplated the consequences of his act.

Whether premeditation is present in a given case is a question of fact to be determined by the jury from all

the circumstances of the case, such as the use of a deadly weapon upon an unarmed victim. * * *

The first assignment of error is overruled.

During interrogation, by the police, defendant was asked to take a dermal nitrate (paraffin) test and allow his finger nails to be scraped. Defendant refused to allow these tests. Upon the trial one of the officers, on direct examination, was asked if defendant would consent to such tests and the trial judge allowed the officer to answer. A few days later the trial judge withdrew this matter from the jury admonishing them not to consider it in arriving at their verdict. When the defendant took the stand he was examined about this matter on direct examination. Defendant explained he was denied counsel and therefore just refused all tests even though he had nothing to hide. The admission of this testimony, by the officer, is the basis of the second assignment of error.

One of the leading cases on the admissibility of the results of a paraffin test is *Brooke v. People,* 139 Colo. 388, 339 P.2d 993 (1959) in which the Court said:

To paraphrase the authorities which have considered the efficacy of the lie detector, we hold that the paraffin test has not gained that standing and scientific recognition or demonstrated that degree of reliability to justify courts in approving its use in criminal cases. Therefore, because of its unreliability it was error to admit the results of the paraffin test as conducted on the body of the decedent, and if Brooke had submitted to the test the result thereof also would not have been admissible in evidence. This being true, the fact that the defendant refused to take the test was likewise inadmissible. The inference to be drawn from both the

testimony of the result of the paraffin test on the decedent, as well as those which probably were drawn by the jury from the recital of Brooke's refusal to take the test were prejudicial.

■ The court is holding in the *Brooke* case that the results of a paraffin test are not admissible on the grounds they are not reliable. This is also the holding in *Born v. State,* Okl.Cir., 397 P.2d 924 (1964). In Tennessee we do not have a case dealing with the admission into evidence of the results of a paraffin test. We do have a case dealing with the admission into evidence of the results of a lie detector test and have held such is inadmissible including the circumstance surrounding the taking or not taking of such a test. *Marable v. State,* 203 Tenn. 440, 313 S.W.2d 451 (1958); *Grant v. State,* 213 Tenn. 440, 374 S.W.2d 391 (1964). It results and we so hold the results of a paraffin test or the refusal to take such test are not admissible into evidence. In so holding we are not unaware there are states holding to the contrary. See *Coleman v. State,* 151 Tex.Cr. 582, 209 S.W.2d 925 (1948); Wharton's Criminal Evidence, Vol. 2, Sec. 664, pp. 580-585 (1955).

This court has repeatedly held that where incompetent proof is introduced before a jury and the trial judge thereafter definitely withdraws it, with proper instructions, it is no cause for reversal. *State v. Ray,* 104 Tenn. 33, 54 S.W. 978 (1900); *Colquit v. State,* 107 Tenn. 381, 64 S.W. 713 (1901); *Cooper v. State,* 210 Tenn. 63, 356 S.W.2d 405 (1962). A Federal court in *Looker v. United States,* 2 Cir., 240 F. 932 (1917), held:

It is only when evidence erroneously admitted in a criminal case is of such apparent weight and so preju-

dicial in effect that the judicial warning against it seems light and unavailing by comparison that the error remains uncured by striking it out.

■ The question here for decision is whether this statement of the police officer, made before the jury, that defendant refused to take these tests was in fact prejudicial to defendant even though the trial judge admonished them not to consider it. In 24B C.J.S. Criminal Law, sec. 1915 (2) p. 53, we find the following:

The erroneous admission of evidence, if it may have operated to the prejudice or harm of accused, or deprived him of a substantial right or a fair trial, necessitates a reversal of the conviction, where the record shows nothing which can fairly be said to cure the effect of such error.

Whether error in the admission of evidence is prejudicial is gauged by the substance of the evidence, its relation to other evidence, and the peculiar facts and circumstances of the case, and whether such admission is sufficient ground for reversal depends on the facts in each case; and the appellate court will consider the record as a whole in determining the question of prejudice or reversibility. Doubts as to whether the erroneous admission of evidence was prejudicial should be resolved in favor of accused. Error in the reception of evidence is less likely to be regarded as harmless in a close case.

The fact that evidence other than that which was improperly admitted is sufficient to justify a conviction does not make the admission of the incompetent evidence harmless, since it cannot be said what weight the jury gave to the evidence in reaching their verdict.

The reviewing court will reverse a conviction where it cannot say from the record that the evidence erroneously admitted was not prejudicial to accused, or that it did not affect, or contribute to, the verdict rendered.

Defendant cites *People v. Hardy*, 33 Cal. 2d 52, 198 P.2d 865 (1948), for the proposition that:

Under ordinary circumstances the trial court is permitted to correct an error in admitting improper evidence by ordering it stricken from the record and admonishing the jury to disregard it, and the jury is presumed to obey the instruction. * * *

It has also been held that in certain cases where the incompetent evidence goes to the main issue, and where the proof of defendant's guilt is not clear and convincing, that the error in admitting the incompetent evidence cannot be cured by striking out and instructing the jury to disregard that evidence.

First, under this entire record we think the proof of defendant's guilt is clear and convincing. Second, the results of a paraffin test even if admitted would only show whether or not defendant had recently fired a gun. There is other evidence in the record not only, that defendant had recently fired a gun, but that he had fired the gun killing Paula Herring. We do not think under the circumstances and the entire record this evidence was prejudicial to defendant. The second assignment of error is overruled.

As noted above in this opinion some very damaging evidence against defendant was obtained by fibers found on a dark suit of clothes owned by defendant. This suit had been sent, by defendant, to a local cleaner to be

cleaned. This cleaner, voluntarily, gave the police possession of the suit taking their receipt therefor. Defendant, by the third assignment of error, alleges this suit was obtained by an unauthorized, unlawful and unreasonable search and seizure in violation of his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States.

What we have here is a search of a bailee's premises with the bailee consenting to the search and seizure. The defendant takes the position an owner of property always has the requisite standing to object to unreasonable search and seizure even though he does not own the premises searched nor have possession of the seized article. In support of this position defendant cites, *United States v. Lester,* D.C., 21 F.R.D. 381 (1957); *United States v. Elkins,* D.C., 195 F.Supp. 757 (1961); *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *Pielow v. United States,* 9 Cir., 8 F.2d 492 (1925); *State v. Bernius,* 177 Ohio St. 155, 203 N.E.2d 241 (1964). These cases do support defendant's position.

There are, however, cases contrary to the position taken by defendant. *United States v. Reiburn,* 2 Cir., 127 F.2d 525 (1942); *United States v. Walker,* 2 Cir., 190 F.2d 481, cert. denied 342 U.S. 868, 72 S.Ct. 109, 96 L.Ed. 653 (1951); *United States v. Eldridge,* 302 F.2d 463 (1962). In the *Eldridge* case the defendant had loaned his car to a friend. This car, while in possession of his friend, was searched by police, with the consent of this friend, and stolen radios found therein. The Court said:

Not every search made without a warrant is illegal. The Fourth Amendment prohibits only "unreasonable" searches and seizures. * * * Had the police done

more than look with Nethercott's consent into the trunk and observe what was readily visible and not covered over or concealed in package or wrapper—if, for example, they had explored under the floor carpeting or behind the upholstery — we might have a different case. * *

Conscious of our duty to maintain jealously the constitutional standards of the Fourth Amendment in criminal prosecutions, and to be on guard against the excesses of overzealous officers, we nevertheless must recognize that some searches may be so eminently reasonable as not to fall under the interdict of the Amendment. Upon consideration of the circumstances we conclude that the bailee's consent made this a reasonable search.

The case of *United States v. Coots,* 196 F.Supp. 775 (1961) is from the Eastern District of Tennessee. The court said:

It is fundamental and well established law that only those persons whose rights have been infringed by a search and seizure may invoke the constitutional guaranty against illegal searches and seizures. Thus, one cannot complain of an illegal search of a premises which he does not own or have some possessory right in or in which he has no interest or makes no claims.

█ There is an apparent conflict in the Federal cases, cited above, on the issue of whether a defendant always has the requisite standing to object to a search and seizure even though he does not own the premises searched nor have possession of the article. Some light is thrown on this apparent conflict when we consider there is always present in all of these cases the issue of whether

or not the search and seizure was reasonable or unreasonable. The constitution only protects against unreasonable searches and seizures. *United States v. Eldridge,* supra.

In the recent case of *Shafer v. State,* 214 Tenn. 416, 381 S.W.2d 254 (1964), certiorari denied by United States Supreme Court, 379 U.S. 979, 85 S.Ct. 683, 13 L.Ed.2d 570, this court speaking through the late Mr. Justice Holmes on the issue of the unreasonableness of searches and seizures said:

Neither the United States Constitution nor the Tennessee Constitution defines ''unreasonable searches and seizures''.

In *United States v. Rabinowitz,* 339 U.S. 56, at page 63, 70 S.Ct. 430, at page 434, 94 L.Ed. 653, it is stated:

''What is a reasonable search is not to be determined by any fixed formula. The Constitution does not define what are 'unreasonable' searches and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case. * * * Reasonableness is in the first instance for the District Court to determine.''

Also in *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726, it is stated:

''We reiterate that the reasonableness of a search is in the first instance a substantive determination to be made by the trial court from the facts and circumstances of the case and in the light of the 'fundamental criteria' laid down by the Fourth Amendment and in opinions of this Court applying that Amendment.'' 374 U.S. at 33, 83 S.Ct. at 1630.

These same rules have been stated by this Court in a number of cases, most recently in *Ellis v. State* [211 Tenn. 321, 364 S.W.2d 925], supra, in which it is stated:

"There is no definite formula for the determination of the reasonableness or the unreasonableness of a search, but each case is bottomed on its own facts. When the question thus becomes a judicial question, we under the doctrine of stare decisis are bound by both the *Elliott* [*Elliott v. State*] (173 Tenn. 203, 116 S.W.2d 1009) and *Bromley* [*Bromley v. State*] (203 Tenn. 194, 310 S.W.2d 432) cases in determining whether or not from a judicial standpoint the search herein was reasonable and legal." 211 Tenn. at 330, 364 S.W. 2d, at 929.

In regard to the police obtaining this suit the record supports the following facts. During the course of his interrogation by police defendant told the officers he had, on that day, left a dark suit belonging to him at a particular cleaner. This was about 9:00 P.M. The officers contacted the people in charge of this dry cleaner and made arrangements to have the suit picked up. The manager of this cleaner went to the plant, found this particular suit, placed it in a box, and voluntarily gave it to the officers sent there for that purpose. This officer gave this manager a receipt for the suit and returned, with the suit, arriving back at 10:00 P.M.

We have here a situation where the police go into a public place (dry cleaner) to obtain a specific article of personal property (suit of clothes), known to be located therein, which article is given them voluntarily by the owner, or those in charge, of this public place. Also prior to going into this public place the police had reason to believe this article of personal property might be of

help in solving a serious crime, and the article was obtained by police without any force, actual or constructive. The fact the police, with permission and presence of the owner, went into this public place at a time the business conducted therein would not be open to the public does not change the character of the place as a public place. This is analogous to a situation where the police go into a pawn shop to obtain, voluntarily, from the owner of the pawn shop, a weapon having been pawned, which they have reason to believe has been used in the commission of a crime.

Tennessee cases on this issue of unreasonable search and seizure, related by analogy to the case at bar since they involve police going into public places, are: *Templeton v. State,* 196 Tenn. 90, 264 S.W.2d 565 (1953); *McCanless v. Evans,* 177 Tenn. 86, 146 S.W.2d 354 (1941); *Lewis v. State,* 181 Tenn. 673, 184 S.W.2d 23 (1944); *Carroll v. State,* 189 Tenn. 351, 225 S.W.2d 532 (1949).

■ As stated in *United States v. Rabinowitz,* supra the reasonableness of searches must find resolution in the facts and circumstances of each case. Upon consideration of all the circumstances we conclude that the bailee's consent made the search in the case at bar, a reasonable search.

■ In this jurisdiction (Tennessee) defendant would have no standing to object to this search since the protection extended by the constitutional provisions only inures to the persons in possession. *Allen v. State,* 161 Tenn. 71, 29 S.W.2d 247 (1930); *Templeton v. State,* 196 Tenn. 90, 264 S.W.2d 565 (1954); *Lester v. State,* 216 Tenn. 615, 393 S.W.2d 288 (1965).

The third assignment of error is overruled.

On the issue of newly discovered evidence five affidavits were filed which are summarized as follows:

1. A service station attendant remembers servicing the car used by defendant on February 22nd and 24th 1964 and states it had no rattles or noise.

2. A statement by a witness that a bloody man was seen in the "Krystal" on the night of the murder.

3. A statement by a witness that a bloody man, with a defective car, was in a motel on the night of the murder.

4. A statement by a witness that Dr. Murray Cooke told her a lot of things about how defendant was innocent and Al Baker guilty. Dr. Cooke had testified about defendant shooting his pistol into the ground the night of the party.

5. Statement of a newspaper reporter that in discussing the evidence with Al Baker, that Al Baker said, "that I fired. * * * I mean Clarke fired the night of the party."

The evidence offered by the second and third affidavit would not be relevant to this case. There is no evidence to connect bloody men seen in the general neighborhood on the night of this murder with the crime for which defendant was being tried. The evidence offered by the other affidavits either is cumulative or attempts to impeach a witness. See *Crittendon v. State,* 157 Tenn. 403, 8 S.W.2d 371 (1928); *Gentry v. State,* 184 Tenn. 299, 198 S.W.2d 643 (1947); *Parham v. State,* 78 Tenn. 498 (1882); *Marable v. State,* 203 Tenn. 440, 313 S.W.2d 451 (1958); *Hill v. State,* 211 Tenn. 682, 367 S.W.2d 460 (1963). The fourth assignment of error is overruled.

We find no merit in the fifth assignment of error and same is overruled.

Judgment affirmed.

## Petition to Rehear

The defendant has filed an able and earnest petition to rehear as a result of our opinion filed 2 February 1966. This petition points out no material fact overlooked, nor cites any new authority or argument not considered by this court in its original opinion. Under Rule 32 of this Court the petition to rehear is overruled.

BURNETT, CHIEF JUSTICE, and WHITE, CHATTIN and CRESON, JUSTICES, concur.