**Oplis WRIGHT, Plaintiff in Error,**

v.

**STATE of Tennessee, Defendant in Error.**

Court of Criminal Appeals of Tennessee.

March 13, 1973.

Certiorari Denied by Supreme Court
July 2, 1973.

————◆———

Hollis A. Neal, Neal & Craven, James-town, for plaintiff in error.

David M. Pack, Atty. Gen., W. Henry Haile, Asst. Atty. Gen., Nashville, Robert T. Beaty, Asst. Dist. Atty. Gen., Oneida, for defendant in error.

## OPINION

OLIVER, Judge.

Represented by retained counsel below and here, Oplis Wright has duly perfected an appeal in the nature of a writ of error to this Court contesting the validity of his conviction of second degree murder and 10-year penitentiary sentence adjudged by the Criminal Court of Fentress County.

By his Assignments of Error here the defendant challenges the sufficiency of the evidence to warrant and sustain the verdict of the jury, insisting specifically there was no evidence that he acted out of malice in killing the deceased and, therefore, that the evidence does not support the verdict of second degree murder and is only sufficient to sustain a conviction of voluntary manslaughter.

The principles to which we must adhere in reviewing a record when such Assignments are advanced have been enunciated so very many times by our Supreme Court and this Court that they are now common knowledge in the legal profession. The jury's verdict of guilt, approved by the trial judge, strips the defendant of the presumption of innocence, with which the law clothed him throughout his trial, and he stands before this Court presumed to be guilty and he has the burden here of demonstrating that the evidence preponderates against the verdict and in favor of his innocence. The verdict so approved accredits the testimony of the prosecution witnesses and establishes the State's theory of the case. We may review the evidence only to determine whether it preponderates against the verdict, and in doing so we are required to take the verdict as having established the credibility of the State's witnesses. The verdict may not be overturned on the facts unless the evidence clearly preponderates against it and in favor of the innocence of the accused. Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, 1 Tenn.Cr.App. 1, 425 S. W.2d 799; Hancock v. State, 1 Tenn.Cr.

App. 116, 430 S.W.2d 892; Morelock v. State, 3 Tenn.Cr.App. 292, 460 S.W.2d 861; Chadwick v. State, 1 Tenn.Cr.App. 72, 429 S.W.2d 135; Phillips v. State, 2 Tenn.Cr.App. 609, 455 S.W.2d 637.

This rule governing appellate review of criminal convictions makes unnecessary and, indeed, inappropriate, any detailed discussion of the evidence pro and con. Hargrove v. State, 199 Tenn. 25, 28, 281 S.W. 2d 692, 694; Morrison v. State, 217 Tenn. 374, 397 S.W.2d 826, 400 S.W.2d 237.

This record tells a tragic story, a sordid saga of extended marital infidelity culminating in a shoot out between the unfaithful wife's husband and her paramour during which the former was killed and the latter was wounded. This occurred about 2:30 a. m. July 19, 1970 in the trailer home of the deceased Robert Katron.

At the hospital shortly after the shooting, and after being fully advised concerning his constitutional rights in keeping with the *Miranda* mandate and after signing a waiver, the defendant told the Tennessee Bureau of Identification investigator that he had been out with the deceased's wife several times during the past two years; that "Me and Robert argued over Mona sometime back. He had not told me to stay away from her. We had not argued any during the time I was at the trailer on this occasion"; that he had the .38 Colt revolver in his pocket because he was intending to trade it to Cum Crabtree for a .22 automatic rifle; that he went to sleep shortly after getting into the old station wagon; that the next thing he knew, about 2:30 or 3:00 o'clock the next morning, the deceased with a gun in his hand "was waking me up and telling me to get the hell out of there" and returned to the trailer; that when he started to leave he heard the deceased's wife call for him to come there, that the deceased was going to kill her; that he did not intend to stop at the trailer as he started out to the highway to get a ride, but in passing the open kitchen door he saw the deceased pointing a gun at his wife's chest; that although he said nothing, the deceased turned and started shooting at him, striking him with the first shot; that he then pulled his gun and returned the fire; that the deceased ceased firing, took about two steps back toward the sink still holding his gun; that he did not see the deceased fall, and then threw his own gun into the weeds behind the trailer and walked out to the road to wait for the law; that he went back to the trailer and looked in and the deceased's wife asked him to help get the deceased into the car and he told her that was useless because he was dead.

The deceased's brother testified that the defendant lived in the trailer home with the deceased's wife for many weeks while the deceased was in Illinois. Both he and the deceased's sister testified the deceased suffered from heart trouble. The sister testified that when she visited him the defendant was usually there, and that on occasions he was there alone with the deceased's wife. A deputy sheriff testified that he had seen the deceased's wife and the defendant together in town on different occasions, and once she made the defendant's bail bond when he was arrested for drunkenness. The county sheriff testified that he had seen the defendant and Mrs. Katron together several times, sometimes alone and sometimes when her children were along; that on different occasions she and the defendant came to the jail to see the deceased when he was in jail, and that the deceased and Mrs. Katron came to see the defendant when he was in jail, and that she came to the jail alone one time to get the defendant out of jail; that on one occasion both the deceased and the defendant were in jail at the same time and Mrs. Katron came to the jail and posted bond for the defendant and left her husband in jail; and that since the death of the deceased he had seen Mrs. Katron and the defendant together 15 or 20 times.

Christy Katron, the daughter of the deceased whom he took to the home of an-

other daughter shortly before the shooting, testified as a prosecution witness that when she and sister Linda returned home about 8:00 p. m. on Saturday from a trip to the Smoky Mountains with their dates, the defendant and her parents were in the kitchen; that the defendant came into the living room and pulled some cartridges out of his pocket and said, "I've got the nerve"; that later her parents became involved in an argument and her father took her to her sister's home and as they were leaving the defendant was sitting under a tree in the yard and told her "I'll kill him before the night is over"; and that her father took some pills and was mad, but she didn't think at the time that he and the defendant were angry at each other.

Ether Thomas, an employee of Fitzgerald's Jewelers, testified that the day before the shooting the defendant was in the store and that Mrs. Fitzgerald asked him who that good-looking woman was he was running around with; and that the defendant replied that she was a married woman but that it didn't make any difference because "he's moving out today. If he don't by God, I'll move him out." The defendant denied making that statement.

The deceased's wife Mona was a defense witness in the trial. She testified in material substance that she and her husband had known the defendant about all their lives. He and "we went everywhere together," and he had visited in their home "Many and many and many occasions," there had never been any trouble between them, and he had continued to visit her after her husband's death. She refused to answer when asked whether she had been having an affair with the defendant, but admitted telling TBI Agent Marcum that she had been in love with the defendant for about two years. She said that she and her husband had been separated for three years and that her relationship with the defendant had no effect on her husband; that they were not living together and he had been working elsewhere but had a wreck and had to come home. She said that the defendant was at their home Saturday night, July 18th, and "everything were just fine up until about 10:00 o'clock. We had all been listening to the Grand Old Opry . . ."; that when the deceased told her he was going to take the defendant home she told him not to do so because he had lost his driver's license as a result of an accident in Illinois in which a man was killed and he had been told not to drive any more; that the deceased suffered from "black-out spells" and had wrecked three cars while in that condition; that as she and the deceased argued about this matter his eyes looked funny; that she hid the car keys and crawled under the trailer; that the deceased had a gun and began cursing and said he would kill her if he found the keys; that the defendant left while she was under the trailer; that efforts to reason with her husband were futile and he took their daughter Christy to the home of another daughter; that she went to bed, and when the deceased returned he was getting into a worse condition and had difficulty talking, wanted to know where the defendant was and said he was going to take him home and went outside with a gun in his hand; that she closed the front door and wouldn't let him back in and he broke the rear door open and grabbed her by the arm and pulled her head back and put the gun to her temple and told her, "I'm going to kill you"; that when she screamed their daughter Linda came in and told the deceased, "Daddy, don't do that"; that the defendant then appeared at the door and told the deceased, "Robert, don't do that," and the deceased turned and shot the defendant and they then began shooting at each other. She said the deceased fired two or three times before the defendant returned the fire and moved through the door into the trailer after firing the first time; that the deceased did not shoot more than one time after falling to the floor; and that the defendant left when the shooting was over.

The defendant testified that he had known the deceased and his wife all his life; that he is married but his wife has been in a mental institution for nine years;

that he ran around with the deceased and Mrs. Katron and was a close friend but never had an affair with her, had no ill will toward them and never threatened the deceased; that the deceased lost his driver's license when he had a wreck in Illinois; that about 2:00 p. m. on Friday (July 17, 1970), at the deceased's request, he went to their home to take him to a doctor; that he remained there that night, sleeping on the floor, and the next day he and the deceased drove around and drank some beer, but he did not get drunk; that about 8:30 Saturday night he felt sick and left the trailer and laid down in a station wagon parked outside; that after a while he began feeling better, could hear the deceased and his wife arguing, walked down to the road and attempted unsuccessfully to catch a ride home and then went back to the station wagon and fell asleep; that about 2:30 a. m. he heard a man's and a woman's voices, and the woman called to him by name; that when he walked up to the open rear door of the trailer and stepped up on the concrete platform he saw the deceased with a gun in one hand and holding Mrs. Katron with the other; that when he told the deceased "Don't do that, Robert. Stop. Don't do that," the deceased wheeled around and fired twice at him with the .22 revolver, striking him once in the shoulder; that he then pulled his own gun from his hip pocket and returned the deceased's fire and they continued shooting at each other; that after being shot the deceased stepped backwards and fired again and must have fired another shot after falling to the floor; that after the shooting he went outside and reloaded his gun and put it in the station wagon; that three or four weeks earlier while working for another man he had found this gun wrapped in a plastic fertilizer bag and lying in a fence row and subsequently bought cartridges for it and was intending to trade it to Cum Crabtree for a .22 automatic rifle; that Mrs. Katron asked him to take the deceased to the hospital, but upon looking at him he realized he was dead.

Of course, the general rule is that killing with a deadly weapon raises a presumption of malice sufficient to justify a finding of murder in the second degree, in the absence of facts or circumstances rebutting that presumption. Gordon v. State, Tenn.Cr.App., 478 S.W.2d 911; Bailey v. State, Tenn.Cr.App., 479 S.W.2d 829, and authorities cited therein.

This record leaves no doubt whatever that this gun battle was a mutual combat after it got started. Unquestionably, whatever their feelings toward each other because of the defendant's open and prolonged attentions to the deceased's wife and her reciprocation, at this fatal meeting their pent-up feelings erupted suddenly when the defendant undertook to dissuade the deceased from his apparent intent and purpose to kill his wife. Then it was that the deceased turned his revolver on the defendant and began firing and the defendant responded with his own. This record demonstrates conclusively that the deceased was the immediate originator of this fight and the defendant voluntarily elected to stand and exchange gun fire with him.

TCA § 39–2409 defines manslaughter:

"Manslaughter is the unlawful killing of another without malice, either express or implied, which may be either voluntary upon a sudden heat, or involuntary, but in the commission of some unlawful act."

In Cooper v. State, 210 Tenn. 63, 76, 356 S.W.2d 405, 411, the Court said:

"The general rule is that 'if a man kills another person, upon sudden heat produced by adequate provocation it is voluntary manslaughter'. There must be sudden heat from such provocation to negative malice. Young v. State, 30 Tenn. 200 and other cases.

"Again in Haile v. State, 31 Tenn. 248, and supported by the cases of Manier v. State, 65 Tenn. 595, and Seals v. State,

62 Tenn. 459, the Court said:—'If, upon a sudden quarrel, two persons fight, and one kills the other, this is voluntary manslaughter'.

"It is said in 40 C.J.S. Homicide § 48, Subsection (b), page 912, that 'homicide resulting from mutual combat or the excitement and heat of passion arising therefrom is voluntary manslaughter. There must be a mutual intention to fight, and, it has been held, deadly or dangerous weapons must be used.' Our Court in the case of Hunt v. State, 202 Tenn. 227, 303 S.W.2d 740, approved this statement."

See also: Mosley v. State, Tenn.Cr.App., 477 S.W.2d 246.

We are convinced from reading this record that the defendant is guilty of voluntary manslaughter and not murder in the second degree. Accordingly, we modify the judgment of the trial court so as to adjudge the defendant guilty of voluntary manslaughter and fix his punishment at imprisonment in the penitentiary for two years—the minimum for that offense (TCA § 39–2410), provided the State agrees. Otherwise, if the State does not consent, the judgment of the trial court will be reversed and this case remanded thereto for a new trial.

GALBREATH and O'BRIEN, JJ., concur.