# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 28, 2009 Session

## STATE OF TENNESSEE v. MICHAEL D. SWEAT

**Appeal from the Criminal Court for Knox County**
**No. 81531    Kenneth F. Irvine, Judge**

---

**No. E2008-00423-CCA-R3-CD - Filed January 15, 2010**

---

The Defendant, Michael D. Sweat, was convicted by a jury in the Knox County Criminal Court of aggravated robbery, a Class B felony, and was sentenced by the trial court as a Range II, multiple offender to seventeen years in the Department of Correction.  The Defendant appeals, contending (1) that the evidence is insufficient to support his conviction, (2) that he was denied his constitutional right to a fair trial when the State suborned perjury, (3) that the State impermissibly shifted the burden of proof to the Defendant when it questioned why additional alibi witnesses were not called, (4) that the trial court erred when it allowed the admission into evidence of his prior convictions, (5) that the trial court erred when it failed to allow the Defendant to poll the jury, and (6) that he was denied a fair trial because the verdict was based on juror misconduct.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Mike Whalen, Knoxville, Tennessee, for the appellant, Michael D. Sweat.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Philip H. Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## BACKGROUND

This case arises from a December 11, 2004, aggravated robbery that took place in a Kroger parking lot. Due to the court reporter's equipment failure, the direct examination and part of the cross-examination of the first witness, Robert Mackey, were not recorded and are not part of the record. The remaining portion of Mr. Mackey's testimony indicates he was parked in the Kroger parking lot on the night of the robbery. He observed a man in a Cadillac pull up behind the victim's car, remain for several minutes, and then pull away. On cross-examination, Mr. Mackey was presented with five of the six photographs from the photograph lineup used to identify the Defendant. He said that none of the photographs were of the person who robbed the victim. He said that the perpetrator had a full, gray beard. On redirect examination, he said that he came to court on March 26, 2007, and recalled seeing the Defendant that day. He said that the Defendant looked the same on March 26 as he did on the day of the trial. He said there was no doubt in his mind that the Defendant was the person driving the car the night the victim was robbed. On recross-examination, he said he would not agree that the Defendant was clean-shaven on March 26 but that the Defendant had been cleaner cut.

Valerie Duncan testified that she was fifty-two years old and had been employed by Home Federal Bank for nineteen years. She said her duties at the bank included dealing with large commercial depositors, cash management customers, and electronic banking customers. She said that she worked with numbers all day long and that she had to remember number sequences and account numbers. She said she once visited a client whose telephone number had changed. She said that as she approached the client's office, she noted a business sign displaying the new telephone number. She said she told her assistant that she needed to write down the telephone number when they left the client's office. She said that after she left her meeting, she correctly remembered the telephone number without seeing the sign again.

Ms. Duncan testified that on the night of December 11, 2004, she had gone to Kroger to buy groceries. She said her son worked there, that he had finished work at 10:00 p.m., and that he had shopped with her for a while before leaving for home. She said she bought her week's groceries, put them in the grocery cart, and pushed the cart out to her car. She said her car was parked close to the front of the parking lot, in the first spot not reserved for handicapped drivers. She said she drove a 1999 Dodge Grand Caravan with a lift gate. She said she stood at the back of her car, opened the lift gate, and started to put her groceries in the car. She said she became aware of a car driving up from Broadway toward the front of the store. She said the car stopped even with the back of her car. She said she did not think there was anything unusual about it, and she did not pay it much attention until the car

stopped directly behind hers. She said that the car was six to eight feet from her and the back of her car.

Ms. Duncan testified that she did not pay attention to the make or model of the car until the driver stated, "Give me all your money." She said that initially she did not turn around and told him that she did not have any money. She said that she had worked downtown for nineteen years and her habit when encountering street people was to avoid eye contact, tell them she did not have any money, and hope that they continued on their way. She said that she employed the same tactics on that night. She said that the driver stated, "Give me your wallet or I'll have to shoot you" and that she turned to look at him.

Ms. Duncan testified that the driver was male and that he had a newspaper over one hand. She said she immediately thought that he was hiding a gun under the newspaper and that it was pointed in her direction. She said that the car was an older model Cadillac and that the driver was unkempt with a bushy beard and wild hair. She said his beard looked as if it had a reddish tinge. She said his hand was up at chest level as if he were pointing a gun at her. She said she started digging in her pocketbook for her wallet. She said that because she had her driver's license, credit cards, and checkbook in her wallet, she hoped that he would take only the cash. She said she asked the man, "Did you want the money from my wallet?"

Ms. Duncan testified there was no question in her mind that the man was serious. She said she pulled about seven dollars from her wallet and handed it to the man through the Cadillac's open window. She said that she got closer to the car but that she never saw a gun. She said that she got a good look at the man and that he wore a heavy jacket. She said that the man took the money and started to drive off. She said that he drove to the end of the row of parked cars, stopped, and then turned left. She said that when he stopped, he stuck his head out of the window and apologized for robbing her but said that he needed to have Christmas.

Ms. Duncan testified that the car was a cream or yellow color and that she was able to note the license tag number. She said that the license tag was a disability tag with a wheelchair on it and that the number was 23865. She said she remembered the number. She said that she was able to see the number as soon as the car pulled far enough in front of her for her to see its back end. She said she was able to look at the number for a period of about ten seconds. She agreed that she was able to study and remember the number because she had looked at it when the car had stopped before turning left. She said the car turned left again onto Highland Drive. She said that as soon as the car left the parking lot, she got a scrap of paper out of her purse and wrote down the license tag number. She said that only one person was inside the Cadillac and that it was very cluttered, with items piled in the front

and back seats.  Ms. Duncan identified the scrap of paper on which she had written the license tag number and confirmed that the number was 23865.  She testified that the paper also listed the name and telephone number of Robert Mackey.

Ms. Duncan testified that after she spoke with Robert Mackey and wrote down his contact information, she got into her car and telephoned her husband because he was a police officer.  She said she was "rather shaken" at that point.  She agreed that her husband came to the parking lot later that evening.  She acknowledged that she called 9-1-1 after she called her husband.  She agreed that the police responded, that they spoke with her, and that they took information from her at the scene.  She identified the Defendant as the person who robbed her in the Kroger parking lot.  Ms. Duncan testified that from the night of the robbery until the date of the trial, she had seen the Defendant at court several times.  She said that the Defendant had combed his hair and that the last time she had seen him in court on March 26, 2007, the Defendant had been completely clean-shaven.  She agreed that she had seen the Defendant four or five separate times during the course of the proceedings.  She acknowledged that the Defendant's appearance had changed over time but that the changes involved only the presence or lack of facial hair.  She said that she had never seen the Defendant before December 11, 2004.  She said there was no doubt in her mind that the Defendant was the person who had robbed her.

Ms. Duncan testified that on the Monday following the robbery, her husband called her at work and told her he had driven by the address to which the car was registered.  She said her husband drove her to the house at approximately 11:00 a.m.  She identified a photograph as depicting the house on James Drive.  She noted that the photograph showed a vehicle parked next to the house.  She identified another photograph that she said showed the car that the man who robbed her was driving.  She said she was positive the car was the same.  She said that the car in the photograph was the car parked beside the Defendant's house on the Monday following the robbery.

Ms. Duncan said that on the Tuesday morning following the robbery, Sergeant Tom Cox of the Knox County Sheriff's Office and her husband came to her office.  She said that Sgt. Cox presented a photograph lineup to her and that her husband had nothing to do with presenting the lineup.  She said she was able to identify an individual in the photograph lineup and that she remembered the eyes of the man who had robbed her.  She said that she wrote on the back of the lineup, "On December the 14th, 2004, I identified subject No. 5 as the man who robbed me on December the 11th, 2004, at Kroger on North Broadway at Highland Drive."  She said that she signed and dated the lineup at 11:45 a.m.  She identified the photograph lineup and identified her writing on the back of it.

On cross-examination, Ms. Duncan testified that she drove a red Dodge Grand Caravan. She said she was putting groceries in the back and had the lift gate up. She agreed that the car had stopped between six to eight feet from her and that she was standing at the center back of her van. She acknowledged that she did not see the car pull up but that she turned around when someone spoke. She said that when she turned, she was facing the driver's window. She said that she had made mistakes with numbers and that she had mis-dialed a telephone number even when it was a number she had memorized. She said that she was not "the best typist in the world" and that she sometimes typed in incorrect numbers at work.

Ms. Duncan testified that Officer Cindy DeMarcus was the first officer on the scene the night of the robbery. She said she was well aware of posts in the parking lot, and she acknowledged that the posts were painted yellow. She said that she did not pay attention to the color of the posts that night but that she knew they were painted yellow because she had shopped at that store since it opened. She said she did not have difficulty seeing the Defendant in his car. She said that the lights in the parking lot had a sodium or mercury vapor that created an orange tinge. She said she did not know whether the white patrol cars would have an orange tint to them because of the lights. She agreed that the light shone no differently on the police cruisers. She said that she had reviewed the in-cruiser video taken the night of the robbery. She said she knew Officer Bates of the Knoxville Police Department (KPD), and she agreed that the video showed Officer Bates's patrol car pull up directly in front of Officer DeMarcus's patrol car. She agreed that the patrol cars appeared white in the video, not orange-tinted, but she said she also had personal knowledge that patrol cars were white. The video was not played for the jury. Ms. Duncan was shown a photograph of the car she had identified as having been parked beside the Defendant's house. She testified that the car appeared white in the picture. She said that she was not suggesting that the car in the photograph was a different color.

Ms. Duncan testified that she had described the car as a really old, early 1970s model Cadillac. She said the Cadillac was big. She acknowledged that she had described the Cadillac as yellow and "disreputable looking." She said that "disreputable looking" meant that it was piled with junk. She said she never told anyone the Cadillac's model year was 1989. She said she had trouble remembering the model year of her own car. She agreed that she thought the car was an early 1970s model and that the driver was a larger man with a full beard. She agreed that she had described the driver as in his fifties and that he looked as if he had led a "rough life."

Ms. Duncan was presented with photographs from the photograph lineup. She testified that the man in the first photograph looked young, and she agreed that the photograph did not match the description of a fifty-year-old man with a full beard who

looked as if he had lived a hard life. She agreed that the man in the second photograph did not have a beard, but she said he could be in his fifties if he had led a hard life. She acknowledged that the man in the third photograph did not have a beard and did not look to be in his fifties. She said that the man in the fourth photograph had a beard. She said she would not describe the man in the fifth photograph as being in his fifties or looking as if he had a hard life. The photographs were received into evidence.

Ms. Duncan testified that the man who robbed her told her to give him her money or he would have to shoot. She said that she did not tell police that the man had his hand in his lap. She said she could not tell whether the man had a gun because his hand was hidden. She said the only way for her to have known would have been for her to put her "face in front of what might possibly have been a gun."

Ms. Duncan said that the police arrived between five and ten minutes after the robber left. She agreed that she had stated to Officer DeMarcus that she did not believe the man really had a gun. When asked whether it was accurate to say that she told police "the whole thing seemed kind of laughable," she said that she may have made that statement because the man who robbed her seemed inept. She said that she would not dispute the video. She said that she was "shaken" by the robbery. She said that her husband told her to call 9-1-1. She said that it may not have been a full ten seconds that the Cadillac stopped before turning left and exiting the parking lot. She said that the conversation between herself and the robber lasted about a minute. She said that the time from the robbery until the police showed up was no longer than ten to twenty minutes.

Ms. Duncan testified that the man who robbed her stopped his car and turned around and apologized. She said that she gave that information to the police but could not recall on the video where that occurred. She recalled sitting in general sessions court with Detective A.J. Leoffler, but she did not recall Det. Leoffler pointing out the Defendant. She said that her husband was sitting in the conference room with her when Sgt. Cox presented her with the photograph lineup. She said that only she, her husband, and Sgt. Cox were present when she identified the Defendant from the photograph lineup. She recalled that on the night of the robbery, Officer DeMarcus told her they had tracked the license tag to an address in South Knoxville. She remembered that Officer DeMarcus said it was odd that the man would drive all the way to Fountain City because there was a Kroger in South Knoxville. She said there was a discussion about whether the address was incorrect or whether the person to whom the car was registered had moved. She said she believed her husband told her the address he took her to on Monday following the robbery was the one obtained when the officers had run the license tag number at the scene. Ms. Duncan said that there was only one Cadillac in the driveway of the house on James Drive. She said that during the robbery she observed that there was a lot of junk in the car but that she did not spend a great deal of

-6-

time peering into the car. She did not recall seeing a big, red toolbox in the backseat. When presented with a photograph of the toolbox, she said that she did not recall seeing it.

On redirect examination, Ms. Duncan testified that the "stuff" or "junk" she saw in the Cadillac was similar to other items she saw in the photograph of the toolbox. She said that she did not get out of the car or inspect the Cadillac when her husband took her by the Defendant's house. She said that the car in the photograph was the same car at the Kroger parking lot and that the tag number was burned into her memory. She said the tag number in the photograph was the same as on the Cadillac she saw the night of the robbery. She said she was frightened and the experience was traumatic. She said that she did not make a mistake when she wrote down the license tag number and Mr. Mackey's name and telephone number.

On recross-examination, Ms. Duncan testified that she was in a state of shock at the time of the robbery. She said it was a surreal experience and that it was one she had never expected to happen. When asked if in her experience her memory was best at times when she was in shock, she replied that it was. She acknowledged that it would be more difficult for her to remember the phone number after her business meeting than it would when she was in a state of shock.

Mike Duncan testified that he was employed as a captain in the Criminal and Civil Warrants Unit of the Knox County Sheriff's Office (KCSO). He said that he had worked in law enforcement for thirty years and that he had been a captain for about five years. He said that four and a half of his thirty years in law enforcement had been with the KPD. He said that his wife called him about 10:20 p.m. on December 11, 2004, and she told him she had been robbed in the Kroger parking lot as she was putting her groceries in the car. He said she sounded very upset. He said that he asked her if she had called 9-1-1 and that she said she had not. He said that he told her to call 9-1-1 and that he would meet her at the parking lot. He said that he dressed and that he and his son drove to Kroger, about five blocks from their house. He said that when he arrived, Officer DeMarcus was taking a report. He said he thought Officers Kent Bates and Greg Taylor were there. He said the exchange between his wife and Officer DeMarcus took approximately ten minutes. He said his wife described a big, light-colored or yellow, older model Cadillac, and she had seen the car's disabled license tag number. He said that KPD officers ran the license tag number and that it matched a Cadillac located at James Drive. He said that the officers instituted a "be-on-the-lookout-for," or BOLO, request, but it yielded nothing. He said that on the Monday morning following the robbery, he drove by the address on James Drive and saw an older model, dingy white, four-door Cadillac parked in the driveway, with its front end toward the street. He said that he could not see the tag number but that it looked very much like the car his wife had described. He said that at eleven o'clock that morning, he picked up his wife from her

office and drove her by the house. He said that he asked his wife if the car looked like the one used in the robbery and that she said it did. He said that he did not have a camera with him at the time but that he went back later that day, around noon, with a camera. He confirmed that a photograph showed the house on James Drive.

Capt. Duncan testified that he telephoned Lieutenant Gary Price with the Organized Crime Department. He said he and Lt. Price had worked together previously in the Narcotics Unit. He said that he obtained a copy of the police report and that he saw that Detective Loeffler had been assigned to the case but that Det. Loeffler was not yet on duty. He said that Lt. Price accompanied him to the house on James Drive. He said this was his third trip to the house, and the car was still there. When presented with a photograph of the Cadillac, he confirmed that he had taken the photograph. He said that he took photographs to record the car, its general condition, and the license tag number. He said the car was in a rough condition and its paint was a dull, dingy white. He said a large amount of junk was piled up in the front and back seats, including clothing and boxes. He confirmed that a photograph showed a tool box and a garbage bag in the back seat. He said the junk looked like items that one would find in a rummage sale. He confirmed that another photograph showed a large Rubbermaid container with a plaid bag, similar to a laundry bag, on top of it. He confirmed that a photograph showed the license tag number identical to the one his wife had reported.

Capt. Duncan testified that he talked to the Cadillac's registered owner, Mabel Varner. He said Ms. Varner stated that the car did not run, that it did not have a battery in it, and that it had not been moved for about two years. He said she suggested that someone had stolen the license tag. He said he went outside to take pictures of the car while Lt. Price remained inside with Ms. Varner and Ms. Varner's granddaughter, Summer Parham. He said Ms. Parham later attempted to remove the license tag, but she could not because the bolts were badly rusted. He said he observed the rust around the bolts. He said that he and Lt. Price opened the Cadillac's hood and saw a battery in the battery compartment. He said the battery was not connected but the terminal posts and connectors were very shiny as if they recently had been removed. He said the cable clamps had no rust on the inside. He said there were no pictures of the battery and cables because he ran out of film.

Capt. Duncan testified that he learned that Ms. Varner lived at the James Drive house with her daughter, the Defendant, her granddaughter, and her granddaughter's husband. He said Lt. Price obtained physical descriptions of the people who lived there. He said he learned the Defendant was approximately the same age as the suspect his wife had described. He said he located the Defendant's photograph and police record. He said he spoke with Sgt. Tom Cox about a photograph lineup, but he was not sure whether Sgt. Cox or he caused the photograph lineup to be created. He said he thought the photograph lineup was assembled

by Sgt. Ed Young. He identified the photograph lineup that had been created and said that after its creation, he took possession of it. He said he accompanied Sgt. Cox to his wife's office. He said he asked Sgt. Cox to present the photograph lineup to his wife because he felt uncomfortable in his capacity as both an officer and the victim's husband, and he felt that it would have been inappropriate for him to present the photograph lineup. He said he did not participate in any way in the presentation of the lineup. He said that he remained in the same room with his wife during the photograph lineup but that he did not physically show her the lineup and tried to avoid eye contact with her during the process. He said he did not give his wife any secret signals during the lineup. He confirmed that he did not tell her to pick photograph number five. He said that he had presented lineups to people in the past and that Sgt. Cox had presented the lineup in the customary manner.

Capt. Duncan testified that he observed his wife's reaction to the photograph lineup. He said he was concerned the lineup was "too good" because several people in the lineup looked similar. He said his wife looked at the lineup for a few seconds and identified the suspect. He said she wrote on the back of the photograph and indicated the person she had identified as the perpetrator. He said that to further the investigation, he caused several copies of the photograph lineup to be delivered to Lt. Price and to Det. Loeffler.

On cross-examination, Capt. Duncan confirmed that he and Lt. Price went to the James Drive address and took photographs. He said he had a twelve-exposure roll of film. He said he lifted up the Cadillac's hood. He said he was certain that the battery was a top-post battery and not a side-mount battery. He said he was certain that the battery had posts on which clamps where placed and tightened with bolts. He identified a photograph which showed Lt. Price and the Cadillac. When presented with another photograph of the same car, he said that it was an enlargement of one he had taken and that it showed leaves in the Cadillac's air intake. He agreed that the front seat did not seem to have items thrown randomly in it, but bags packed as if to be transported to a flea market.

Capt. Duncan testified that the case was investigated by the KPD and that the KCSO was not officially involved. He said he notified his chief deputy that he was going to assist in following-up on the robbery because Det. Loeffler had not contacted him. He said that when he arrived at the scene of the robbery, other witnesses were describing the suspect. He said he did not meet Mr. Mackey. He said that he had reviewed the video from Officer DeMarcus's police cruiser. He confirmed that he heard the car described as an old, yellow Cadillac. He disagreed that he heard the suspect described as a man in his fifties. He said his wife described the suspect as a man with a reddish beard with white or gray in it. He confirmed that he thought the lineup was good because several of the people in it matched the suspect's description. When shown the photograph lineup, he described one of the individuals as thirty or thirty-five years old, with a receding hairline and a reddish beard. He said that another man in the lineup looked to be the same age as the Defendant and that he

had a goatee. He said yet another man in the lineup was clean-shaven. He said the beard was not the only identifying characteristic of the individuals in the photograph lineup. He said that witness descriptions were not absolute. He acknowledged that he had training in developing a photograph lineup and that one school of thought was to present the photographs one at a time. He said that when compiling a photograph lineup, he would want people with similar characteristics. He agreed that he would want a witness to pick a person out of a lineup who was the actual suspect and not the person who looked most like a suspect. He agreed that it was unusual for the husband of a victim whose law enforcement department was not involved in the investigation to take a photograph lineup to a witness. He said it was also unusual for the victim not to be contacted by the investigator. He said it was usual in the KCSO for there to be some follow-up on an aggravated robbery within a few hours. He said he did not do anything to taint the process. He said it was important that an investigation occur contemporaneous to a crime. He said his wife called the KPD and was told that an investigator was assigned to her case and would be in touch. He disagreed that he had been told or taught that a person with intimate knowledge of a case should not present a photograph lineup.

Capt. Duncan testified that he knew where to look for the Cadillac because he learned the address at the scene of the robbery. He said he did not go by the address on the night of the robbery because his wife was upset and he had tried to comfort her. He said that Ms. Varner told him the
Cadillac had not run in two years. He said he did not wonder why there were leaves in the air intake of the Cadillac if it had been used in a robbery within the past forty-eight hours. He said that Ms. Varner told him there was no battery in the Cadillac. He agreed that the Defendant was reported as being forty-three years old at the time of the robbery. When asked if he would describe a forty-three year old man as an "older gentleman," he said that would not be the first description. He agreed that he investigated the case by causing a photograph lineup to be run and by going to the Defendant's home.

On redirect examination, Capt. Duncan testified that he knew what the Defendant looked like at the time he gave the photograph lineup to Sgt. Cox. He said that he ordered the lineup but that he did not tell anyone who to put in the lineup or the age of anyone to be included in the lineup. He said that he did not personally select the photographs for the lineup. He said that he was unaware of any improper preparation or presentation of the lineup. He said that in the photograph of the car taken the Monday after the robbery, the windshield appeared clean with no leaves on it. On recross- examination, Capt. Duncan testified that he stood by his assertion that the photograph lineup was fair.

Captain Gary Price of the Organized Crime Unit testified that he had been employed by the KPD for approximately twenty-five years. He said he was a lieutenant at the time of

the robbery. He said that on December 13, 2004, Capt. Duncan informed him that Capt. Duncan's wife had been involved in a robbery and that Capt. Duncan had found the car used in the robbery at an address on James Drive. He said Capt. Duncan asked him to go to the address to determine who drove the car. He said the report described the suspect's car as a yellowish, four-door Cadillac, and it listed the license tag number as registered to Mable Varner at 1406 James Drive. He said he and Capt. Duncan arrived at the James Drive address at approximately 12:45 p.m. He said he asked permission of the residents to come inside and speak with them. He said that Ms. Parham and Ms. Varner were there and that both he and Capt. Duncan spoke with them. He said he also spoke with the Defendant's wife on the telephone before he looked at the car. He said that the car was parked beside the house and that Capt. Duncan took photographs. He said that he examined the car and the license plate and that it was clear the license tag had not been removed because the bolts were rusted. He said that Ms. Parham attempted to remove the license plate with pliers and a screwdriver but that it would not come off. He said that when he checked under the hood, a battery was sitting unsecured on the battery tray. He said the battery did not appear to have been in the car very long because it was fairly clean, unlike the rest of the engine. He said that battery cables were not attached but that the bolt in the positive cable was shiny, as if it had been placed there recently. He said the negative cable had oxidized. He said that he was familiar with batteries and the oxidizing process from his own experience. He said that if the bolts are exposed to air and moisture, the metal will dull. He identified a photograph of the car taken that day. He said that there were items in the car and a seat cover or something was thrown over them. He said there was no accumulated dirt on the windshield but the car had some leaves on it.

Capt. Price testified he learned that Ms. Varner, the Defendant, the Defendant's wife, and Mr. and Ms. Parham lived at the house. He said the Parhams were both nineteen years old and the Defendant and his wife were both forty-three years old. He said he estimated Ms. Varner's age to be in the eighties. He said that based on the descriptions he received from Ms. Varner and Ms. Parham, the Defendant most closely matched the description of the suspect who committed the robbery.

On cross-examination, Capt. Price testified that Ms. Varner asked him if he thought it would be a good idea to remove the license tag from the Cadillac. He said he told her that it would, and he asked Ms. Parham to remove it. After looking at a photograph of the license tag, he said that the tag had expired in April 2005. He agreed that there was dirt on the back end of the car and leaves on the front air intake near the windshield. When presented with a photograph of the car's battery, he said that without seeing the entire engine compartment he could not say whether the positioning of the battery and its cables was the same in the photograph as on the day he saw them. He agreed that the general configuration of the cables was the same as the day he investigated. He said that there was no carport over the Cadillac.

He said that if a car were not driven for a while there would be a buildup of debris on it but less if the car had been driven recently. He agreed that the car was exposed to rain and wind. He said that he guessed one of the people in the photograph lineup was in his early to mid-twenties. He agreed that Mr. Parham would not have been much younger than the person in the lineup. He said the car parked at the Defendant's home matched the description of the four-door, yellowish Cadillac involved in the robbery. He acknowledged that the description of the car was important, but he said the license tag number was the most important fact.

On redirect examination, Capt. Price testified that the amount of leaves on the car did not indicate that the car had not been driven for a long period of time. He said it was December and leaves were blowing around. He said it was likely for a car to have leaves or dirt accumulated on it. On recross-examination, Capt. Price testified that he did not see any leaves on the tree or in the yard in the photograph.

Sergeant Tom Cox testified that he had been employed with the KCSO for nineteen years. He said he was assigned to the Internal Affairs Unit and that he assisted in other investigations from time to time. He said that he had known Capt. Duncan for a long time and that Capt. Duncan asked for his assistance in putting together the photograph lineup. He said that Capt. Duncan gave him suspect identifiers. He said he did not have the program that created the photograph lineups on his computer, and he asked Sgt. Young to generate it. He said that based upon suspect identifiers entered by the program operator the computer would generate a comparison of people of similar age, race, gender, hair color, and eye color. He said that the procedure of providing identifiers to the program operator was common practice. He said that the photograph lineup was the most common lineup procedure, but occasionally police presented video evidence or conducted a show-up within one hour of the crime. He said that physical lineups were rare. He said the photograph lineup in this case was generated upon his request. He said he showed the lineup to the victim three days after the robbery and asked her if she could identify the person who had robbed her. He said that the victim was seated at a table and that he told her he was going to show her six photographs all on one page. He said he told the victim to take her time and make a thoughtful, careful decision. He said he did not tell her that the suspect was in the lineup. He said he purposely chose not to know which photograph was the suspect's to avoid inadvertently alerting the victim. He said he asked Capt. Duncan to stand behind the victim because he did not want any accusation that they had somehow manipulated the lineup. He said the victim identified photograph number five, which was the suspect. He said she studied the photograph lineup for only a few seconds. He said he then verified with Capt. Duncan that the photograph was of the person whose identifiers Capt. Duncan had provided. He said the victim wrote a statement in his presence on the back of the photograph lineup. He said he had no other involvement in the case.

-12-

On cross-examination, Sgt. Cox testified that the case was never officially a KCSO case. He recalled that he, not Capt. Duncan, had requested the photograph lineup. He agreed that it would be suggestive to present one photograph at a time and ask, "Is this the guy?" He said he did not recall ever showing a lineup to a victim or witness that did not contain the suspect. He said he did not enter the age of "fifty" as an identifier in the program that generated the lineup. He said the suspect's birth date was entered. He said he had not interviewed the victim and had no idea of what age she had described the suspect as being. He said the program used the most recent photograph of the suspect that was in the system. He said that if a suspect's most recent photograph was twenty years old, they would use that one. He clarified that he first asked the victim to identify the suspect from the photograph lineup and then he asked Capt. Duncan in the victim's presence to confirm that the photograph was of the suspect. He said that he saw no impropriety in verifying for the victim that she had made the correct choice.

A.J. Loeffler testified that he worked for ten years as a Violent Crimes Investigator with the Violent Crimes Unit of the KPD. He said that he had been employed by the KPD for fifteen years. He said that he had investigated many "crimes against persons," including robberies, murders, and rapes. He said that the KPD investigates more violent crimes than the KCSO. He said that on the night of the robbery, he was working on another case and could not leave to go to the scene of the robbery. He said he preferred to go to the scene and talk to the witnesses and victim right away. He said that on the Monday following the robbery he had received a voicemail message from Lt. Price about the case. He said the initial report was lying on his desk, the manner in which he was usually assigned cases.

Investigator Loeffler said the message from Lt. Price stated that he had found the vehicle involved in the robbery, that he had spoken to the residents at the house and had a possible suspect, and that photograph lineups were being created. He said that requesting a photograph lineup would be the normal course of procedure once he had the name of a suspect. He said that at the time, the KPD did not have access to booking photographs and that the KCSO would create the lineup after receiving the suspect's name, date of birth, race, and "I.D.N." number. He said the process took several days. He said he received copies of the lineup on December 14, 2004, one of which had been written on by the victim. He said that he showed Mr. Mackey the photograph lineup and that Mr. Mackey identified the suspect. He said that he told Mr. Mackey that he did not know if the suspect was in the lineup, that Mr. Mackey should not feel pressure to pick out anyone, and that he would prefer Mr. Mackey say he was not sure rather than pick the wrong person. He said that it did not take Mr. Mackey long to identify the suspect. Mr. Mackey identified the Defendant as the suspect in the photograph lineup.

On cross-examination, Investigator Loeffler testified that he was aware of the descriptions of the suspect and the car after he received the initial report. He said he was aware the witnesses had described the Cadillac as yellow and in rough condition. He said he went to the Defendant's house on December 13 and 14. He agreed it was within his duties as an investigator to send a car to the suspect's house on the night of the robbery. He said he was working on another case the night of the robbery and could not leave. He could not recall whether he was notified of the suspect's address on the night of the robbery. He said that when he went to the house, he noted that the paint job on the car was rough, as if it had not been buffed or washed in a long time. He said that brown marks were on the car and that the hood had a place that appeared burned. He stated the vehicle looked as if it could run, and he said that he had seen cars in all sorts of conditions on the roads. He said he talked to the victim a few days after the robbery. He stated that checking under the car's hood was not part of his investigation. He said he knew that other law enforcement officers had been to the house, had talked to the residents, and had taken photographs before he did. He said the Defendant came to the department and was cooperative during questioning. He stated that the Defendant's wife was present during questioning but that he could not recall whether the Defendant's daughter was there. He said the Defendant was not under arrest at the time of the questioning. He said the Defendant stated he drove a Nissan Sentra to work.

Investigator Loeffler testified that the Cadillac did not look yellow in the photographs. He said he was never told that the car in question was a 1970s model Cadillac. He said the report listed the car as a 1989 four-door Cadillac. He said that the color difference did not bother him because in many cases, the victim gives the wrong color of a car. He said he did not contact two other witnesses. He said he did speak to the other people at the Defendant's residence.

On redirect examination, Investigator Loeffler testified that he had driven a car around with leaves in the intake. On recross-examination, he acknowledged that leaves blow off the front of a car when it is moving at a high rate of speed, but he said he also had had to pull them out of the air intake. The State rested.

The Defendant did not testify. Roger Fisher testified that he owned Paradise Taxi and Paradise Chauffeur. He said that the Defendant had been his employee since 1996. He stated that in December 2004, he was a subcontractor for United Parcel Service (UPS) and that the Defendant was making package deliveries for him. He agreed he was hauling fairly small items. He said he became aware of the Defendant's transportation problems when he saw the Defendant walking across a bridge in Knoxville. He said he gave the Defendant a ride. He said the Defendant told him that the Defendant's car was broken and that the Defendant had been taking taxicabs for transportation. He said he loaned the Defendant a Nissan to drive because the nature of his business required the Defendant to make deliveries

in a timely manner. He said that the Nissan was registered to him but that it was in the Defendant's possession in December 2004. He said he knew the Defendant had been arrested. He said that he saw the Defendant's wife driving the Nissan the day of the Defendant's arrest and that it was filled with items. He said the Defendant's wife told him she was going to sell things to get enough money for bail. When he was shown a photograph of the Cadillac, he said that he had seen the car at the Defendant's house but that he had never seen the Defendant or the Defendant's wife drive it.

On cross-examination, Mr. Fisher testified that he still owned the Paradise Taxi Company. He agreed that an investigator from the district attorney general's office had called and requested records. He said that he did not bring the records because he had received the call only two or three days earlier and that he had been unable to assemble them. He said that his secretary had been out sick, that the records were filed in boxes, and that it would take some time to get the records from December 2004. He said that the Defendant had been paid cash commissions based on his deliveries. He said that he kept a record of each time the Defendant was paid and that he filed an Internal Revenue Service Form 1099. He said that the district attorney general's office did not tell him to bring the boxes containing the records to the trial. He said he did not know where the Defendant was at 10:20 p.m. or at 10:30 p.m. on December 11, 2004. He said he had no knowledge of which car the Defendant was driving the night of the robbery. On redirect examination, Mr. Fisher testified that the assistant district attorney's office had requested the records three or four days before and that they had not informed him they had contacted defense counsel about obtaining the records.

Gary Lynn Hood testified that he owned Gary's Garage on Maryville Pike. He said that he had recently met the Defendant but that he knew the Defendant's mother-in-law, Ms. Varner, from his church. He said he had worked on the family's vehicles. When presented with a photograph, he said he recognized the Cadillac. He said that Ms. Varner had brought him the Cadillac for service and that he had told her it was not safe to drive. He said he told her it would be cheaper to buy a new car than to fix it. He said this exchange took place in September of 2003. He said that he had not worked on the car and that he had not been asked about working on the car since that time.

On cross-examination, Mr. Hood agreed the car was driven to his shop by a family member, but he said that the car would not hold power steering fluid and that Ms. Varner could not turn the steering wheel. He said he thought he gave a record of the September 2003 inspection to one of Ms. Varner's children. He identified an invoice from July 2, 2004. He said that he had worked on a thousand cars since the Cadillac and did not remember the exact date he had inspected the Cadillac. He agreed that he had no knowledge of the

Defendant's whereabouts on December 11, 2004. He acknowledged that he had no information on whether the Cadillac ran on December 11.

On redirect examination, Mr. Hood testified that the estimate dated July 2, 2004, was for an engine replacement. He said that after he wrote an estimate, he would have given the original to the car's owner and retained a copy. He said that the license tag number on the estimate was the same as in the photograph of the Cadillac located at the Defendant's house. He said the Cadillac was a 1989 model. On recross-examination, Mr. Hood said that he had not seen the Cadillac since July 2004. He said that he was just guessing when he said that he had last seen the car in September 2003.

John Sweat testified that he was the Defendant's brother. He said that he and the Defendant worked for Paradise Transportation in December 2004. He said that he was working on December 11, 2004, and that he received a telephone call about 7:30 p.m. to make a delivery. He said he picked up the parcel from the UPS warehouse that was to be delivered to the UPS warehouse in Nashville. He said he went to the Defendant's house to see if he could talk the Defendant into making the delivery for him. He said that the Defendant did not agree. He said that the defendant had made similar deliveries previously. He said that he had thirty minutes from the time of the telephone call to pick up the package and that he went to the Defendant's house afterwards. He said that the package had to be in Nashville by midnight. He said that he received a cash payment for deliveries and whether he made the delivery on time determined whether he was paid.

Mr. Sweat testified that the Cadillac at Ms. Varner's residence had "been messed up forever." He said that the Defendant and the Defendant's wife used to live two houses from Ms. Varner. He said that the Cadillac was located at that residence at one point and that he pushed it to Ms. Varner's house. He said that the Cadillac had been in the same place from that date until the date of the trial. He said that when he went to the Defendant's house on the night of December 11, 2004, the Defendant had his nieces over and was filming them with a video camera. He said the Defendant said he was going to watch a movie with his nieces. He said the nieces were small children. He said the Defendant had purchased the video camera that day. He said he left the Defendant's house at 9:45 p.m. and headed to Nashville. He said he did not know the Defendant's whereabouts at 10:20 p.m. that night but that the Defendant was still at home at 9:45 p.m.

On cross-examination, Mr. Sweat testified that he had met with the assistant district attorney general because his name had been provided as an alibi witness. He said he remembered the assistant district attorney asking what kind of car the Defendant drove. He said that he thought the Defendant drove a 1987 or 1988 white Mazda van. He said that he thought that was the car the Defendant was driving on December 11, 2004. He disagreed that

he no longer believed that was correct and said that "we went through a lot of cars." He said that he specifically remembered leaving the Defendant's house at 9:45 p.m. and that he returned before midnight. He confirmed that he first went to the Defendant's house at 7:30 p.m. He admitted that he may have told the assistant district attorney general that he arrived at the Defendant's house about 8:00 p.m. and agreed that it actually might have been closer to 8:00 p.m. when he arrived. He said that he left the Defendant's residence by himself and that neither the Defendant nor the Defendant's wife walked outside with him. He said that the Defendant drove a white Mazda van to make deliveries. He said that he could remember that the Defendant was driving a Nissan Sentra during that time period. He said that he had never been in the Cadillac and that he did not know if it ran. He said he had only seen Ms. Varner and the Defendant's wife drive the Cadillac and that had been before July 2004. He said he would not agree that the car had been driven in July 2004 because he had no knowledge. He identified a picture of the Defendant in the photograph lineup.

On redirect examination, Mr. Sweat testified he remembered exactly when he left the Defendant's house because it was important that he deliver the package on time or risk losing the contract. He said it took two hours and thirteen minutes to drive to Nashville and there was a time change which helped him meet the deadline. On recross-examination, Mr. Sweat testified that he wanted the Defendant to take the package. He said that he could have telephoned the Defendant to ask him to take the package but that he drove to the Defendant's house instead.

Connie Sweat testified that she had been married to the Defendant for eleven years. She said that she was the last person to drive the Cadillac and that she last drove it in the summer of 2004. She said that the car had not been running for a while and that she started it to prove to her mother, Ms. Varner, that the car was inoperable. She said she drove the car for approximately three blocks, at which point the car stopped running and she had to push it back to the driveway. She said that she kept the car despite its poor condition as an incentive to help Ms. Varner recover from a bad fall. She said Ms. Varner did not want anyone to touch the car until Ms. Varner was well enough to drive. She said that at one time, she lived two houses away from Ms. Varner's house. She said she kept the Cadillac at her house. She said that she, her husband, and two neighbors pushed the car to Ms. Varner's house and that it would not start. She said they backed the car into Ms. Varner's driveway, and the car had remained there until the trial.

Ms. Sweat testified that she received a call from her daughter on Monday, December 13, 2004, informing her that the police were at Ms. Varner's house and that they claimed Ms. Varner's car had been involved in a robbery. She said she told the officer over the telephone that the car had not been moved and that it did not run. She said she asked the person on the telephone if she were in a Candid Camera or Funniest Videos episode. She said she thought

it was a joke. She identified Investigator Loeffler and said he came to her house to interview her husband and son-in-law. She said she did not participate in the conversation between her husband, her son-in-law, and Investigator Loeffler. She said she received a call from Investigator Loeffler informing her that he had additional questions to ask the Defendant. She said that she asked the Investigator if he was going to arrest the Defendant and that the Investigator replied that he did not have an arrest warrant. She said she contacted the Defendant through his company. She said the Defendant was in Morristown making a delivery. She said that the Defendant returned and that she accompanied him to the police station. She said she informed Investigator Loeffler after he arrested the Defendant that the car did not run. She said that other than defense counsel, only the assistant district attorney general had asked her any questions about the case. She said that while the Defendant was under arrest, she used Mr. Fisher's Nissan to travel to and from her work. She said they purchased the white Mazda van after the robbery.

Ms. Sweat testified that on the date of the robbery, she and the Defendant had plans to clean the house, haul away garbage, and take care of the Defendant's grandnieces. She said the nieces were two years old and five weeks old. She said they planned to keep the children all night. She stated that after they hauled away the garbage, they went to a pawn shop and bought a video camera. She said she wanted to make a video of the children because they did not get to spend a lot of time with them. She said they left the pawn shop, picked up the children, and returned home, where she stayed the rest of the night. She said the Defendant left the house at about 6:00 p.m. She said her nephew picked up the Defendant and took him to her nephew's house. She said her nephew was selling the Defendant a black Oldsmobile. She said the Defendant called her and informed her that he would take longer than expected because the car had a flat tire. She said the Defendant returned home before 8:00 p.m. She said spider webs were underneath the Cadillac's hood. She said she told the police that the car did not run. She stated that while she and the Defendant were seated in general sessions court awaiting a hearing, Det. Loeffler pointed them out to the victim.

On cross-examination, Ms. Sweat testified that she received a letter from the assistant district attorney general and that she met with him the week before trial. She said she could account for the Defendant's whereabouts, her whereabouts, and her children's whereabouts on the day of the robbery and on the day following the robbery.

Ms. Sweat testified that a family member drove the Cadillac to Mr. Hood's shop in September 2003. She said that she drove the car in July 2004 and that it did not run properly. She said she parked it on the street for about four or five days. She said she called Mr. Hood, who came to her house in July 2004 and gave an estimate on repairs. She said the car would not "crank[] back up." She said they pushed the car into the driveway. She stated that the

license tag had expired and that she confirmed the rust around the bolts made it impossible to remove the license tag. She agreed that she was concerned someone had stolen the license tag and that Det. Price had told her it would be a good idea to remove it from the car. She said she did not know why her daughter tried to remove the license tag in Det. Price's presence, but she agreed that she asked her daughter to remove it. She agreed that if the tag number had been given as being involved in a robbery, it was a mistake.

Ms. Sweat testified that on the day of the robbery, she and her husband returned home about 5:00 p.m. She said her husband left the house again with her nephew around 6:00 p.m. She acknowledged that the Defendant planned to watch a movie with her and her nieces and that the movie started at 9:00 p.m. She said that the Defendant's brother came to their house twice, once after 8:00 p.m. and again between 9:30 p.m. and 9:45 p.m. She said that he did not stay long. She said that he wanted the Defendant to ride with him to Nashville. She said that he talked to the Defendant outside on the porch. She said that she walked outside onto the porch at one point and a neighbor saw them. She said the neighbor was not at the trial because he was in the military in Kentucky. She said that she and the Defendant watched the 11:00 p.m. news and went to bed. She said that her daughter, her son-in-law, and her mother were also with them when they watched the movie. She agreed that the other adults could establish the Defendant's whereabouts during that time period.

In rebuttal, Det. Loeffler testified that he did not recall pointing at Ms. Sweat and the Defendant in general sessions court. On cross-examination, he said that he did not deny that it happened but that he could not remember. On redirect examination, he said he would not do something like point out a defendant to a victim.

Ms. Duncan testified on direct examination that she did not meet Det. Loeffler on the day when Ms. Sweat said they were in general sessions court. On cross-examination, the victim testified that she appeared only one time in general sessions court for hearings related to the Defendant's case.

**ANALYSIS**

**I.**

The Defendant first contends that the evidence was insufficient to convict him of committing the aggravated robbery. The State argues that the evidence was sufficient to support the Defendant's conviction. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence

in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

The statute under which the Defendant was convicted provides, "Aggravated robbery is robbery as defined in [Tennessee Code Annotated section] 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon . . . ." T.C.A. § 39-13-402 (2003). The Defendant's reliance on Judge v. State, 539 S.W.2d 340 (Tenn. Crim. App. 1976), is misplaced. In Judge, the victim of a burglary saw the perpetrator's license tag number and recorded it. The victim later misplaced the paper and provided the license tag number to the police from memory. She identified the defendant from a photograph, and she identified him again at the trial. The jury convicted the defendant of second-degree burglary. Although this court reversed and remanded the case on other grounds, it held that the evidence of the memorized license tag number and in-court identification was sufficient to support the defendant's conviction. Id. at 342, 346. In this case, the victim not only memorized the license tag number, she wrote it down within minutes of viewing it.

The crux of the Defendant's sufficiency challenge is to the identity of the perpetrator. The Defendant does not deny that the victim was robbed. He maintains that this is a case of mistaken identity and that he did not rob her. Taken in the light most favorable to the State, the evidence at the trial established that the victim and Mr. Mackey identified the Defendant as the perpetrator of the crime both during a photograph lineup and at the trial. The victim testified that the man who robbed her held up his hand, which was concealed by a newspaper, as if he carried a gun. She described the perpetrator's vehicle as a cream or yellow-colored Cadillac. The victim remembered the license tag number and noted that it was a disabled driver's tag. She wrote down the license tag number within minutes of seeing it. She testified that she worked with numbers and that she had correctly remembered a sequence of numbers after seeing it one time. The license tag number was registered to a Cadillac belonging to the Defendant's mother-in-law, and the Cadillac was located at the Defendant's home. Although it was painted white, the car was dirty and streaked with mud. The victim also identified the Cadillac parked at the Defendant's house as the one used in the robbery. The license tag number matched the number the victim provided to the police. We presume the jury resolved all conflicts in the testimony and that it accredited the victim's and eyewitness's testimony over the Defendant's. We hold that the evidence was legally sufficient to support the Defendant's conviction for aggravated robbery.

## II.

The Defendant contends that he was denied the right to a fair trial when the State suborned perjury in its direct examination of the victim. The Defendant claims that the victim made "undeniably deliberate lies" at the trial when she stated that she thought the Defendant was hiding a gun and that "he meant business." The Defendant says these statements are in direct contradiction to the victim's statements recorded on the responding officer's in-cruiser video immediately following the robbery. During the video, the victim remarked, "I just didn't believe he really had a gun," and "The whole thing was kind of laughable." The video was not played for the jury at the trial, but it was received in evidence during the sentencing hearing and included in the appellate record. As we understand the Defendant's argument, because the State had reviewed the video before the trial and did nothing to alert the jury to what he alleged were the victim's lies, the State engaged in prosecutorial misconduct. The State responds that it did not commit prosecutorial misconduct when it asked the witness about her perceptions of the robbery.

Prosecutorial misconduct does not constitute reversible error unless the outcome was affected to the Defendant's prejudice. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001). In Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court set out the following considerations for determining if the prosecutor's conduct could have improperly prejudiced the defendant and affected the verdict:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

See State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (approving these factors in determining if the  misconduct resulted in reversible error).

-21-

The Defendant cites <u>Clarke v. State</u>, 402 S.W.2d 863 (Tenn. 1966), for the proposition that evidence admitted erroneously necessitates a reversal of a conviction if "'it operated to the prejudice or harm of the accused, or deprived him of a substantial right or a fair trial . . . where the record shows nothing which can fairly be said to cure the effect of such error.'" <u>Id.</u> at 869 (quoting 24B C.J.S. <u>Criminal Law</u>, § 1915 (2) p. 53). <u>Clarke</u> involved an officer's testimony that a defendant refused to take a paraffin test which might have shown whether the defendant had recently fired a gun. Several days later, the trial judge instructed the jury not to consider this evidence when it deliberated its verdict. Our supreme court held that although incompetent proof had been introduced, the trial judge withdrew it and that with a proper instruction, no cause for reversal existed. <u>Id.</u> at 869-70.

Considering the <u>Judge</u> factors, we are unpersuaded that reversible error occurred, nor do we believe that <u>Clarke</u> is applicable to the Defendant's case. A review of the record reveals that the State asked questions about the victim's perceptions during the robbery. As one of the elements of aggravated robbery, the State was required to prove "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401 (2003 & Supp. 2004). Although the victim stated on the video she did not believe the Defendant had a gun, she also testified at trial that the only way for her to have confirmed that suspicion "would have been to put my--my face in front of what might possibly have been a gun." Her comment that "the whole thing was kind of laughable," was made immediately after she told the responding officer that the Defendant had apologized to her for robbing her. When taken in context, the comment more reasonably relates to the Defendant's conduct after the robbery and not to the victim's lack of fear during the commission of the offense. On cross-examination, the Defendant was afforded the opportunity to question the victim regarding contradictions in her testimony, and he did so. As noted above, we presume that the jury resolved all conflicts in the testimony and all questions about witness credibility. We hold that the State did not engage in prosecutorial misconduct when it asked the victim to describe her perceptions during the robbery and that the victim's testimony was not erroneously admitted into evidence.

### III.

The Defendant contends that the State impermissibly shifted the burden to the defense when it questioned why additional alibi witnesses were not called. The State responds that it did not commit prosecutorial misconduct by noting the lack of alibi witnesses. The following exchange occurred during the State's cross-examination of the Defendant's wife, Ms. Sweat:

> [THE STATE]　　　　　　And aside from the neighbor that
> 　　　　　　　　　　　was out on the porch, there were

other adults there in the house watching that movie, right?

A.                  Yes, sir.

[THE STATE]       That would be your–

A.                  My daughter.

[THE STATE]       –daughter, her husband–

A.                  Her husband and my mother.

[THE STATE]       And your mother?

A.                  Yes, sir.

[THE STATE]       And all those individuals could–could establish what the [D]efendant was doing during that time period; isn't that right?

A.                  Yes, sir.

[THE STATE]       And are any of them here?

[DEFENSE COUNSEL]       Your Honor, I'm going to object at this point. We are not required to prove anything. We put this witness on. We don't have to put on four witnesses to say they were all at the same house.

[THE STATE]       I can ask about other witnesses–

THE COURT       That's–that's–no.

[THE STATE]       –to what she's testifying to.

THE COURT       No, no. Sustained.

A prosecutor may comment on a defendant's failure to call a material witness whose testimony would be expected to be favorable. See State v. Francis, 669 S.W.2d 85 (Tenn. 1984). The evidence must satisfy a three-prong test before the state may comment on a missing witness: "(1) that the witness had knowledge of material facts, (2) that a relationship exists between the witness and the party that would naturally incline the witness to favor the party; [and] (3) that the missing witness was available to the process of the court." Delk v. State, 590 S.W.2d 435 (Tenn. 1979). However, "[t]he mere fact that a party fails to produce a particular person who may have some knowledge of the facts involved does not justify application of the inference against him." Francis, 669 S.W.2d at 89. The Delk criteria are to be strictly construed because of the potentially damaging effect on the rights of a criminal defendant. Id.

We conclude that the prosecuting attorney's comments regarding the Defendant's failure to call alibi witnesses were improper. The proper Delk foundation was not laid before the State attempted to question the witness about other missing witnesses. However, the ultimate issue is not whether the prosecuting attorney's remarks were improper, but whether the improper remarks could have affected the verdict. See Judge v. State, 539 S.W.2d 340, 344-45 (Tenn. Crim. App. 1976); T.R.A.P. 36(b).

As noted in the previous section, Judge set out factors for evaluating whether a prosecuting attorney's conduct could have improperly prejudiced a defendant and affected the verdict. Applying the factors, we first note that defense counsel immediately objected to the prosecuting attorney's question, before the witness was allowed to respond. Second, the judge sustained the objection and the witness was dismissed. In addition, following a jury-out hearing that took place immediately before the parties presented their closing arguments, the trial judge ruled that it would not allow the State to raise the issue of missing alibi witnesses during its closing arguments. Third, the jury was instructed before the trial began that the law presumed the Defendant innocent and that the Defendant was not required to prove his innocence. Fourth, as the prosecuting attorney's question is the only error we discern in the Defendant's appeal, there can be no cumulative effect of improper conduct. Fifth, although the evidence was not overwhelming, it was based upon a firm identification of the Defendant and the license plate of the car that was used. In light of the Judge factors, we cannot say that the prosecuting attorney's question more probably than not affected the outcome of the trial. See T.R.A.P. 36(b).

## IV.

The Defendant contends that the trial court erred when it allowed into evidence the Defendant's prior convictions that were too old and stale. The State filed a notice of intent to impeach the Defendant's credibility based on convictions for (1) robbery on September

11, 1978, (2) third-degree burglary on December 6, 1978, (3) burglary of an automobile on December 6, 1978, (4) third degree burglary on December 5, 1984, and (5) escape on February 4, 1988. <u>See</u> Tenn. R. Evid. 609. The trial court ruled that if the defendant testified, it would not allow cross-examination on the 1978 convictions but that it would allow the State to question the Defendant regarding his 1984 burglary and 1988 escape convictions.

Tennessee Rule of Evidence 609(b) provides in pertinent part:

> Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution; if the witness was not confined, the ten-year period is measured from the date of conviction rather than release. Evidence of a conviction not qualifying under the preceding sentence is admissible if the proponent gives to the adverse party sufficient advance notice . . . and the court determines in the interests of justice that the probative value of the conviction . . . substantially outweighs its prejudicial effect.

<u>Id.</u> For purposes of Rule 609(b), the "date of release" is the date on which the sentence expires. <u>State v. Thompson</u>, 36 S.W.3d 102, 110-11 (Tenn. Crim. App. 2000). At a pre-trial hearing on the admissibility of the Defendant's prior convictions, the trial court stated it believed the Defendant's convictions for robbery were stale, and it instructed counsel to raise the issue of the burglary and escape convictions' admissibility again before the Defendant testified. At the trial, defense counsel stated that the Defendant would not testify based on the trial court's ruling that the State would be allowed to cross-examine the Defendant on the prior burglary and escape convictions. The following exchange took place:

> [DEFENSE COUNSEL]: Judge, I would–I only add for the record I think at this point–and part of that is based on your Honor's ruling that the State would be able to cross-examine him on a burglary and an escape charge that fall outside the time limit. But–that's my understanding, it that was your ruling. They couldn't talk about the robbery–

THE COURT: No. I said to bring it up again before he testified, if he testified.

[DEFENSE COUNSEL]: Well, of course, your Honor, that has to play into the calculus of whether he testifies–

THE COURT: I understand, but I did [sic] make that specific ruling.

[DEFENSE COUNSEL]: Would your Honor care to make that specific ruling now?

THE COURT: Well–

[DEFENSE COUNSEL]: As I understand it, it was about one year–the State says 11 years since he was released, so it was about a year outside the 10-year rule.

THE COURT: Yes.

[DEFENSE COUNSEL]: As I understand that rule in reading it, it appears to me that some of the case law says that you have to look at whether or not the conduct complained of is relevant to the truthfulness in this case.

THE COURT: Yes.

[DEFENSE COUNSEL]: That that's what the rule contemplates. That's my understanding.

THE COURT: It may be a bit stale, but–all right.

Rule 609 generally prohibits impeachment of a witness by convictions that are more than ten years old. If the convictions are more than ten years old, the court must determine whether "in the interests of justice . . . the probative value of the conviction, supported by

specific facts and circumstances, substantially outweighs its prejudicial effect." Tenn. R. Evid. 609(b). The trial court believed that the Defendant's convictions were more than ten years old, but it did not determine that their probative value outweighed their prejudicial effect. However, the presentence report shows that the Defendant's confinement for his 1984 conviction for burglary and 1988 conviction for escape did not expire until July 28, 1996. The State argues, and we agree, that these two prior convictions were not more than ten years old at the time of the commencement of the action against the Defendant by presentment on March 29, 2005. Therefore, these convictions were properly admissible into evidence. We hold that the trial court did not abuse its discretion when it ruled that the Defendant could be cross-examined about his prior convictions for burglary and for escape.

## V.

The Defendant next contends that the trial court erred in failing to afford him the right to poll the jury. In his brief, the Defendant says that the trial court did not ask him if he wanted to have the jury members polled individually. He asserts that after the jury returned its verdict, Ms. Sweat collapsed and defense counsel sought to console her. He says that "[w]hen counsel turned around the judge and jury were gone." The State responds that the trial court did not preclude the Defendant from individually polling the jurors regarding their verdict.

The Defendant relies on Clark v. State, 97 S.W.2d 644 (Tenn. 1936), as authority to correct the jury's verdict. However, the court in Clark refused to reconvene a jury after it had been discharged. Id. at 647.

The trial court has the discretion to determine the means by which the jury is polled. See State v. Clayton, 131 S.W.3d 475, 479 (Tenn. Crim. App. 2003). The polling is sufficient so long as the "'answer of the juror . . . indicates with reasonable certainty that the verdict is his [or her] own.'" Id. (quoting Dixon State & Heading Co. v. Archer, 291 S.W.2d 603, 609 (Tenn. Ct. App. 1956)). The record reflects that the trial court conducted a poll of the jury after the verdict was read, and each of the jurors indicated he or she had reached a unanimous verdict by raising his or her right hand. The Defendant is not entitled to relief on this issue.

## VI.

Finally, the Defendant contends that juror misconduct prevented him from receiving a fair trial. However, he has failed to support this issue with any argument, any citation to authorities, or any references to the record. See Tenn. R. Crim. App. 10(b). He is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE